# EXHIBIT 8

**Fleming Terrell**

| | |
|---|---|
| **From:** | Fleming Terrell |
| **Sent:** | Tuesday, August 19, 2008 10:03 PM |
| **To:** | 'rcrass@hensleeschwartz.com' |
| **Cc:** | 'kfoster@hensleeschwartz.com'; Lisa Graybill |
| **Subject:** | A███ appeal |

Dear Ms. Crass,

Thank you for speaking with us again this evening.  This is just to confirm, per our telephone discussion, the the Level Three appeal will be heard in open session at tomorrow night's school board meeting.  For your reference, Texas Government Code s. 551.0821 and Needville ISD Board Policy BEC (Legal) state that the exception to Texas' open meeting requirement for meetings "to deliberate a matter regarding a public school student" that will result in personally identifiable information becoming public does not apply where, as here, the student's parent or guardian has requested in writing that the meeting be open.  Likewise, where a parent has requested an open hearing, the Board must deliberate cases involving discipline of a student in an open meeting under Government Code s. 551.082 and Board Policy BED (Legal).

Thank you also for the written assurance that A███ won't be disciplined until he grant of an injunction or September 22, 2008, whichever is first.  As we noted earlier this evening, we have not previously agreed to affixing A███'s hair to the top of his head as a condition of this assurance - that is something we'd need to discuss with our clients.

We'll look forward to meeting tomorrow at 5:30 to try to get this issue resolved.

Best regards,

Fleming Terrell
Staff Attorney
ACLU Foundation of Texas
611 Congress Ave., Suite 320
Austin, TX 78704
Tel. 512-478-7300 x 128
Fax. 512-478-7303
www.aclutx.org

This communication is for use by the intended recipient and contains information that may be privileged, confidential or copyrighted under applicable law. If you are not the intended recipient, you are hereby formally notified that any use, copying or distribution of this communication, in whole or in part, is strictly prohibited. Please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy. This communication does not constitute consent to the use of sender's contact information for direct marketing purposes or for transfers of data to third parties.

The views and opinions expressed in this communication do not necessarily reflect the official positions of the staff, management and directors of the American Civil Liberties Union, the American Civil Liberties Union Foundation, its affiliates, or its chapters.

10/6/2008

# EXHIBIT 9

1

1

2

3

4

5

6  * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

7              LEVEL III HEARING
   NEEDVILLE INDEPENDENT SCHOOL DISTRICT
8            AUGUST 20, 2008

9  * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

10

11              COPY

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1       MR. KOCIAN:  All right.  Welcome,

2   everybody.  At this time we're going to move up on our

3   agenda to Page 4, which is request for exemptions to

4   the N.I.S.D. policies.

5           Okay.  This is a hearing to consider a

6   Level III student complaint regarding an exemption to

7   the grooming code.  Normally, the Board would conduct

8   this hearing in closed session; however, the

9   complainant has requested a public hearing.  We remain

10   in open session to hear the complaint.  I will ask our

11   attorney to come forward to sit with us as we begin the

12   grievance.

13           Mr. Rhodes, will you trade places with

14   our attorney?

15           MR. RHODES:  Okay.

16           MR. KOCIAN:  I would also ask the court

17   reporter present to come forward and begin taping the

18   hearing.

19           The proceeding will be recorded by Wendy

20   Lege', court reporter, who is here to ensure that an

21   accurate record is kept.

22           For the record, each person is asked to

23   state their name, reason for attendance.  We will start

24   with the Board Members.

25           MR. JANKE:  Kim Janke, Board Member.

3

1               MS. BLACK:  Jan Black, Board Member.

2               MR. WENDT:  Mark Wendt, Board Member.

3               MR. KOCIAN:  Jim Kocian, Board Member.

4               MR. ANDERSON:  Joseph Anderson, Board

5    Member.

6               MR. RASKA:  Mike Raska, Board Member.

7               MR. JANICEK  Chris Janicek, Board Member.

8               MR. KOCIAN:  Okay.  Complainants'

9    attorneys and clients?

10              MS. TERRELL:  Hi, I'm Fleming Terrell.

11   I'm a staff attorney with the American Civil Liberties

12   Union of Texas and I represent Michelle Betenbaugh and

13   Kenny Arocha, along with Lisa Graybill, our legal

14   director.

15              And just by way of background, the ACLU

16   of Texas is the state affiliate of the national ACLU

17   organization and we work to protect the different civil

18   rights and civil liberties in Texas and throughout the

19   country.

20              Do you want me to proceed or should I --

21   do you have --

22              MR. KOCIAN:  No, that's it for right now.

23   I just need an introduction of all that's here as far

24   as yourself and your clients.

25              MS. TERRELL:  Okay.  That's it.

4

1          MS. FOSTER:  I'm Kristen Foster.  I'm the

2    Board's attorney.

3          MR. RHODES:  Curtis Rhodes,

4    superintendent of schools.

5          MR. KOCIAN:  All right.  At this time I

6    would like to instruct all participants to please avoid

7    talking when another person is speaking so that the

8    court reporter can accurately reflect the proceedings.

9    Further, please endeavor to make your oral statements

10   as clear and complete as possible.  Remember that the

11   court reporter cannot reflect gestures or any form of

12   nonverbal communications.  The hearing will be

13   conducted as an administrative presentation in

14   accordance with applicable policies and laws.  The

15   Board Members have been supplied with a copy of this

16   record in advance of this hearing.

17          This is not a formal legal proceeding and

18   no strict rules of evidence or procedure will apply.

19   This hearing is an appeal to the Board regarding a

20   Level II hearing at which the complainants' request for

21   relief was denied.  Each party will have an opportunity

22   to make its presentation to the Board.  The parties

23   will not be permitted to cross-examine each other.

24   There will be an opportunity for the Members of the

25   Board to ask questions of either counsel or any

5

1    witnesses; however, the Members of the Board are not

2    subject to questioning by either counsel or any

3    witnesses.

4                    The Board's decision must be supported by

5    the record made.  The complainants, Ms. Betenbaugh or

6    Mr. Arocha, or their attorneys will present their

7    argument first.  This presentation will be followed by

8    the administration's side.  Both the complainant and

9    the administration will be allocated 15 minutes to make

10   their presentations.

11                   Pursuant to the request by the

12   complainants, Ms. Betenbaugh and Mr. Arocha, this

13   hearing is being conducted in open session, with the

14   vote taken in open session.  Does anyone have any

15   questions as to how this hearing will be conducted?

16                   Okay.  Now that we have reviewed the

17   procedures for the hearing, it is time to determine the

18   qualifications of the Board Members to hear and

19   consider this matter.  I will ask each member of the

20   Board whether you can consider the information

21   presented at this hearing and make a decision in a fair

22   and impartial manner.  If any member of this Board

23   feels that he or she cannot do so, the Board Member

24   should so state at this time and not participate in the

25   hearing.

6

1          Mr. Janke?

2          MR. JANKE:  I can be impartial and fair.

3          MR. KOCIAN:  Ms. Black?

4          MS. BLACK:  I can be impartial and fair.

5          MR. KOCIAN:  Mr. Wendt?

6          MR. WENDT:  I can be impartial and fair.

7          MR. KOCIAN:  Mr. Anderson?

8          MR. ANDERSON:  I can be impartial and

9   fair.

10          MR. KOCIAN:  Mr. Raska?

11          MR. RASKA:  I can be impartial and fair.

12          MR. KOCIAN:  Mr. Janicek?

13          MR. JANICEK:  I can be impartial and

14   fair.

15          MR. KOCIAN:  All right.  Let the record

16   reflect that each Member of the Board present has

17   indicated that he or she can consider the information

18   presented at this hearing and make a decision in a fair

19   and impartial manner.

20          All right.  Ms. Graybill, I think you are

21   going to be making a presentation on behalf of the

22   complainants?

23          MS. GRAYBILL:  Actually, Fleming Terrell,

24   our staff attorney, is going to be making that

25   presentation.  So I'm going to yield the floor to her,

7

1    if that's okay.

2              MR. KOCIAN:  All right.  Fine.

3              MS. TERRELL:  Well, as I have gotten the

4    introductions out of the way already, I will just jump

5    in.  And I believe I have 15 minutes; is that correct?

6              MR. KOCIAN:  Yes, ma'am.

7              MS. TERRELL:  Okay.  Great.

8              MR. KOCIAN:  And when you get to about

9    three minutes, we'll let you know.

10             MS. TERRELL:  Thank you.  I appreciate

11   that.

12             Just by way of background, and I know you

13   all are familiar with this, but for the sake of having

14   it on the record I just want to note that this is the

15   second time that Mr. Arocha and Ms. Betenbaugh have

16   been before this body on this issue.  Ms. Betenbaugh

17   first contacted Needville I.S.D. by e-mail back in

18   November '07 to request information about how to get an

19   exemption for A███████ because of his Native American

20   religion and culture, didn't receive a response and

21   then in May she then contacted Mrs. Sniffin, who told

22   her that boys were required to wear their hair short.

23   She went to Superintendent Rhodes, he denied the

24   request for an exemption and this body denied her

25   request on the grounds that A███████ was not yet enrolled

8

1  in the school district.

2           So just to have it on the record, A█████

3  is now enrolled, the family has moved into Needville

4  and he has told me he is looking forward to starting

5  his first day of school on Monday.

6           So with that sort of procedural issue

7  aside, I want to clarify another point that I think may

8  have been in some question at the last meeting, which

9  is that we are not here trying to get the school board

10 to change the dress code policy.  Whatever the wisdom

11 of having the policy that requires boys to keep their

12 hair short, the state of the laws here in Texas is that

13 generally that type of a policy is permitted.  So

14 Mr. Arocha and Ms. Betenbaugh don't have an argument

15 with the policy itself.

16          Where that type of a policy is not

17 permitted, and the law is clear on that, as well, is

18 where it conflicts with the student's fundamental

19 right.  Among those rights, and the most relevant here,

20 is the right to freely exercise your sincerely held

21 religious beliefs, and that's the right that we're

22 going to focus on today.

23          The reason, and I think everybody

24 understands this but I'm just going to put it out

25 there, the reason is because the 1st Amendment to the

9

1  U.S. Constitution which applies to the school board and

2  the State through the 14th Amendment and also Texas

3  state law, in particular the Religious Freedom

4  Restoration Act, limits the ability of a body such as

5  this to place a substantial burden on a student's

6  exercise of his religious beliefs.  I think everybody

7  understands that and I think we're all on the same

8  page, that if a student shows a religious belief and he

9  shows that he's sincere about it, that the law requires

10  an exemption from the dress code.

11           So with that out of the way, I'll move on

12  to talking about those two more authority questions of

13  is this a religious belief and is the family sincere.

14  And the question -- the answer to both of those

15  questions is yes.

16           I'll start with the religion question.

17  It is difficult to judge what is religious and what is

18  not.  Courts have recognized time and again that it's

19  very hard to look at someone and say, "I do think what

20  you believe is religious," "I don't think what you

21  believe is sufficiently religious."  Of course, it's

22  easier if you have an institutionalized religion, like

23  Christianity or Judaism, but the courts have been very

24  clear that that is not required.  There doesn't have to

25  be an organization that you can show your membership

10

1    card to.  You don't have to join a particular church,

2    and the religion doesn't have to be an organized one or

3    one that's been recognized by some official entity in

4    order to deserve protection under the Constitution and

5    the state law.  So I want to be clear about that, which

6    makes it even more tricky for a court or for a body

7    like this to look at a belief and decide does that

8    count as religious.

9                I'll tell you that courts generally are

10   very deferential because of that difficulty.  They err

11   on the side of taking someone's word for it that what

12   they believe is to be their religious obligation is

13   religious in nature and is sincere, and then I would

14   suggest that this Board should do the same.  However,

15   in this case we have it a little bit easier because

16   there are numerous decisions recognizing Native

17   American spiritual beliefs, including the belief like

18   the one at issue today, that one's hair should be grown

19   long and that it shouldn't be cut except on certain

20   occasions, like to mourn the death of a loved one.

21   Courts across the country have recognized that those

22   are beliefs within the meaning of the 1st Amendment and

23   that they are entitled to protection.  So we really

24   don't have to grapple so hard with that question.

25                In particular, there is one case that

11

1    really is relevant to what the School Board is

2    considering today, which is the case of the Alabama and

3    Coushatta tribes versus the Big Sandy Independent

4    School District, also here in Texas, and that case

5    involved a number of Native American students, I

6    believe they were high school students, who wore long

7    hair.  All of them were practitioners of a modern set

8    of Native American spiritual and religious beliefs that

9    under which they felt like they had to grow their hair

10   long.  Some of them also were practitioners of

11   Catholicism or other non-Native American religion and

12   the court found that that was not a problem, that this

13   is no requirement within the Native American religion

14   and that it be an exclusive belief.  Some of them had

15   parents that didn't practice their religion and that

16   was not considered to be a problem either.

17               I understand with a child at A████'s age

18   the parents' beliefs and practices can be helpful in

19   determining what he is being taught to believe, and I

20   will get into that a little bit further in a minute.

21   But in that case it was, if anything, less clear than

22   it is here that the students in question really had

23   religious beliefs about their long hair and the court

24   upheld those beliefs against the school dress code and

25   I believe that a court looking at this set of facts

12

1  would reach the same conclusion.  So to the extent that

2  that's helpful to you, to know that Native American

3  beliefs, although they vary among different groups, as

4  do any beliefs -- I mean, I wouldn't think that every

5  Baptist believes exactly the same thing, right --

6  although they vary, collectively it has been recognized

7  as a religion.

8            I also want to talk a little bit about

9  tribal affiliation.  Those cases that I mentioned

10 involve people from numerous different tribes and even

11 members who aren't affiliated or members of a

12 particular tribe.  Requiring somebody to show an

13 affiliation or a membership in a particular Native

14 American tribe is no different than requiring them to

15 show membership in a particular church.  It's not

16 necessary for protection under the 1st Amendment and I

17 think that's something that everybody can relate to,

18 that, you know, we don't want the government coming in

19 and evaluating whether we've given adequate proof of

20 what it is that we believe at our most intimate and

21 personal level.  So I hope that helps you to understand

22 sort of why the law is the way that it is.  So that's

23 the religion hurdle.

24            The second hurdle is sincerity and I

25 think there is no question, based on the information

13

1    that we have given you and in particular the

2    information that you'll find in our Level III appeal,

3    that this family is very sincere about their beliefs,

4    including their belief that long hair, that it should

5    be kept long except on certain occasions, such as

6    morning a death.

7         I think, as I said, to a certain extent

8    A_____'s parents' practice is relevant insofar as it

9    shows what they are teaching him.  And I think you have

10   some information in the materials that we've given you

11   that shows that Kenny Arocha has for years now followed

12   the practice of keeping his hair long, and he's done

13   that against, actually, great odds.  He has risked his

14   job for it and in an instance of a really serious

15   medical situation that could have required the shaving

16   of his head he was adamant and insistent and, with the

17   help of his wife Michelle, was able to keep his hair

18   long even when that was against the initial advice of

19   medical personnel.  So I think that should dispel any

20   doubt that he holds this belief very sincerely.

21        And A_____, as well, has not wavered in

22   his practice.  His hair has never been cut in his five

23   years, almost six years.  So it really is difficult to

24   question how sincere these folks are.  I know that it's

25   an unusual or not a very common set of religious

14

1  beliefs, but what really matters and what the courts

2  have said really matters is whether the individual, in

3  good faith, holds those beliefs in the manner that

4  their religion requires them to do or not do whatever

5  act it is at issue.  I think that's really clear here.

6              Another sort of indicator of how sincere

7  they are is that we're here today.  I mean, this has

8  been a month-long process and we've sort of done

9  everything that we can to provide as much information

10 as we can, more maybe than is necessary, to really try

11 to help you all understand the nature of these beliefs

12 and to really ensure that A██████ is able to start

13 school like any other child and not forced to choose,

14 which I don't think we would want anyone to have to

15 choose between his deeply held religious beliefs and

16 getting an education.

17              So I hope that helps to address some of

18 your questions; but I'd invite you, if you have any

19 other questions about what I have talked to you about,

20 to ask them and I'd be happy to try to answer them to

21 the best of my ability.

22              Okay.  Thank you very much.

23              MS. KOCIAN:  Thank you, Ms. Terrell.

24 Members of the Board, I'm going to ask that you hold

25 your questions, if any, until the conclusion of the

15

1    presentation by both sides.  Mr. Rhodes will be making

2    a presentation on behalf of the administration.

3                    Mr. Rhodes, you have 15 minutes.

4                    MR. RHODES:  Good evening, everyone.  My

5    name is Curtis Rhodes.  I am superintendent of

6    Needville I.S.D. and I am the Level II hearing officer.

7    I received Ms. Betenbaugh and Mr. Arocha's complaint by

8    and through their attorney on August 14th, 2008.

9                    The parents have asked for an exemption

10   to the Needville I.S.D. grooming and dress code.  I did

11   not conduct a formal grievance but ruled on the

12   documents presented, as the parties agreed to a prompt

13   decision as to the exemption request in time for an

14   appeal to be heard and decided by the Board of Trustees

15   tonight on August 20th, 2008 at a regular scheduled

16   meeting.

17                    In response to Needville I.S.D.'s request

18   for documentation or support for Adriel's membership

19   and/or adherence to the religion upon which the

20   exemption is allegedly based, counsel for the parents

21   stated that no documentation is required.  I am aware

22   that there is no requirement that a claimed religion

23   meet any organizational or doctrinal test in order to

24   merit 1st Amendment protection; however, I do believe

25   that we are rightfully permitted to ask that A▇▇▇▇▇▇

16

1   supply support for the contention that he sincerely

2   believes in and adheres to his claimed religious belief

3   and be able to express what the claimed religious

4   belief is, as well as be able to distinguish this from

5   a purely personal moral choice.

6           I do not believe that the mere statement

7   that "many Native Americans" subscribe to this belief

8   is sufficient to merit an exemption for A████.

9   Nowhere in the exemption does A████ claim a certain

10  tribal heritage, nor is it clear whether a particular

11  tribe or heritage subscribes to a religious belief

12  centered around the cutting of one's hair.

13          The blood tests provided by Mr. Arocha

14  does not provide evidence to me of his Native American

15  heritage, as the DNA test merely suggests that his DNA

16  structure is consistent with that of a Native American.

17  I believe that Mr. Arocha has cut his hair in the past

18  and has admitted that he cuts his hair on the side

19  because it was hot at work.

20          In addition, although the parents and

21  their counsel claim that a parent's or guardian's

22  practices is not directly relevant to the sincerity of

23  a student's religious belief, because we are dealing

24  specifically with a five-year-old in this case, the

25  parents' adherence to such a claimed religious practice

17

1 and belief is most certainly relevant, if for no other

2 reason than to support the claim that A███████ is being

3 brought up and raised in adherence to certain alleged

4 religious teachings by the choice of his parents.  A

5 claim by the parents that A███████ was asked and does not

6 want to cut his hair, as I was told by the parents,

7 appears to be more of a choice than a sincerely held

8 religious belief.

9          Furthermore, although I understand I'm

10 not allowed to question the sincerity of the belief,

11 with the media attention generated by Ms. Betenbaugh,

12 as well as the comments posted on her personal website,

13 blogs, et cetera, I had trouble making a determination

14 as to whether this was a sincerely held religious

15 belief rather than a personal grooming choice adopted

16 by the parents.

17          As such, at this time my recommendation

18 to the Board is that if the exemption be granted

19 because the Board hears evidence that supports a

20 sincerely held religious belief, that such exemption be

21 granted only for the 2008-2009 school year and that

22 A███████ reapply for that exemption each year.  In

23 addition, if the Board grants such an exemption for the

24 '08-'09 year, I would recommend that while A███████ will

25 not be required to cut his hair because of this

18

1   religious belief, he still be required at school and

2   all school events, both at home and away, to include

3   school trips on any school bus, to wear his hair in a

4   tightly woven single braid down his back with the hair

5   behind his ears, out of his eyes and the braid tucked

6   into the collar of his shirt.  And that ends my

7   presentation.

8                    MR. KOCIAN:  Thank you.

9                    Are there any questions from the Board or

10  responses that should be addressed?

11                   All right.  If there are no questions

12  from the Board Members, this concludes the proceeding.

13                   At this time the Board Members will

14  retire to closed session to deliberate.  We will ask

15  our counsel, Mrs. Foster, to join us to advise us on a

16  procedural or legal matter.  I will remind everyone

17  that no vote will be taken in closed session.  The

18  Board will reconvene in open session to vote on the

19  matter.

20                   All right.  At this time we are going

21  into closed session.  If during the course of this

22  meeting covered by the meeting notice the Board of

23  Trustees should determine that a closed or executive

24  meeting or a session of the Board of Trustees is

25  required, the executive meeting or session, as

19

1    authorized by the Texas Open Meetings Act, Texas

2    Government Code Section 551.001, will be held by the

3    School Board on the date, hour and place given in the

4    meeting notice or soon enough for the commencement of

5    the meeting covered by this notice, as the School Board

6    may conveniently meet in such closed or executive

7    meeting or session concerning any and all purposes

8    permitted by the Act, including but not limited to the

9    following sections and purposes:  To deliberate

10   formally upon the evaluation of the assignment, duty or

11   discipline or dismissal of a public officer or employee

12   here to complain or charge against any officer or

13   employee.

14              Time of adjournment is?

15              MR. ANDERSON:  7:24.

16              (Short recess.)

17              MR. KOCIAN:  Okay.  At this time the

18   Board has reconvened in open session -- Mr. Secretary?

19              MR. ANDERSON:  7:50.

20              MR. KOCIAN:  -- at 7:50 p.m.

21              All right.  Do I have a motion on the

22   Level III complaint?

23              MR. JANKE:  Although I disagree with the

24   law presented in this case and understand and support

25   why Mr. Rhodes made the decision that he made, I move

20

1  that the Board grant the Level III grievance to

2  Michelle Betenbaugh and Kenny Arocha and grant A████

3  an exemption to the grooming code with the following

4  provisions:  The exemption shall only be granted for

5  the 2008-2009 school year and the student may reapply

6  for the exemption each year and during the 2008-2009

7  school year the student will be required to -- will not

8  be required to cut his hair because of his religious

9  belief but will be required at school and in all school

10  events, both at home and away and including the bus, to

11  wear his hair in a tightly woven single braid down his

12  back with the hair behind his ears and the braid stuck

13  in the collar of his shirt; therefore, modifying the

14  decision to deny their request for relief as stated in

15  their complaint.  That's my motion.

16              MR. KOCIAN:  I have a motion by

17  Mr. Janke.

18              MR. JANICEK:  I second that motion.

19              MR. KOCIAN:  I have a second by

20  Mr. Janicek.

21              Is there any other discussion on this

22  motion?

23              If not, all in favor?

24              I have seven ayes; nays, none.  Motion

25  carries.

21

1      All right.   The Board has voted to grant

2  the request for the relief and provide the following

3  specific relief:

4      The exemption shall only be granted for

5  the 2008-2009 school year and the student may reapply

6  for the exemption each year, and during the 2008-2009

7  school year the student shall not be required to cut

8  his hair because of his religious belief but will be

9  required at school and all school events, both at home

10 and away and including the bus, to wear his hair in a

11 tightly woven single braid down his back with the hair

12 behind his ears and the braid tucked into the collar of

13 his shirt.

14      Ms. Betenbaugh, Mr. Arocha, normally we

15 would allow the oral decision to stand.   However, since

16 we have modified the relief you have requested to some

17 extent, I will ask our attorney, Ms. Foster, to provide

18 your counsel with a letter tomorrow that specifically

19 outlines the relief you have been granted by the Board.

20 Thank you.

21      (Meeting adjourned.)

22

23

24

25

22

1    STATE OF TEXAS              *

2    COUNTY OF BRAZORIA          *

3        I, Wendy J. Lege', Certified Shorthand Reporter in

4    and for the State of Texas, do hereby certify that the

5    above and foregoing contains a true and correct

6    transcription of all portions of testimony and other

7    proceedings requested in writing by counsel for the

8    parties to be included in this volume of the Reporter's

9    Record, all of which occurred in open session and were

10   reported by me.

11       I further certify that this Reporter's Record of

12   the proceedings truly and correctly reflects the

13   exhibits, if any, admitted by the respective parties.

14       I further certify that the total cost for the

15   preparation of this Reporter's Record is $ _69.00_ and

16   will be paid by _Ms. Fleming Terrell_ .

17       WITNESS MY OFFICIAL HAND this the _30th_ day of

18   _September_ , 2008.

19

20                          _Wendy J. Lege'_
21                          Wendy J. Lege'
                            Certified Shorthand Reporter
22                          CSR No. 3744
                            Expiration Date: 12-31-08
23                          1021 E. Miller
                            Angleton, Texas   77515
24                          (979) 848-1338

25

# EXHIBIT 10



ATTORNEYS AT LAW

3200 S.W. FREEWAY
SUITE 1200
HOUSTON, TEXAS 77027

AUSTIN • DALLAS • FT. WORTH • HOUSTON • SAN ANTONIO

PHONE: (713) 552-1693
TOLL FREE: (877) 552-1693
FAX: (713) 552-1697
www.hensleeschwartz.com

Kristen Z. Foster
Associate
kfoster@hensleeschwartz.com

September 3, 2008

Lisa Graybill
Legal Director
Fleming Terrell
Staff Attorney
ACLU Foundation of Texas
P. O. Box 12905
Austin, TX 78711-2905

*Via Facsimile: (512) 478-7303*
*Via U.S. Mail*
*Via Email*

Re: Needville ISD – A████ A████

Dear Ms. Graybill and Ms. Terrell:

This letter is in response to your multiple letters and emails sent after the close of business on September 2, 2008 in which you request, again, that Needville ISD refrain from applying the NISD Elementary School dress and grooming code to A████ A████ September 22, 2008. As we stated in our correspondence of August 22, 2008, our previous communications in which a "grace period" regarding discipline for failure to comply with the dress code was discussed was not "unconditional," as you now assert, but in fact based on a request that we allow you time to bring your complaint before a Court if, per your correspondence of August 14, 2008, *"NISD d[id] not grant A████ an exemption by August 20, 2008."* As we stated in our August 22, 2008, correspondence the NISD Board of Trustees did grant your clients' exemption request that he not be required to cut his hair in accordance with his religious beliefs. As such, we say again that because an exemption was granted by August 20, 2008, we see no reason that the dress and grooming policy, as amended for A████ in accordance with his religious beliefs, should not be applied immediately.

A████'s religious beliefs, as you presented them, were amply addressed and remedied by the previously granted exemption to the dress and grooming code and was specifically tailored to his needs that he not be required to cut his hair As such, any substantial burden on A████'s religious exercise that he be allowed to grow his hair without cutting it has been removed and there is no reason with which we have been

HENSLEE SCHWARTZ LLP
ACLU
September 3, 2008
Page 2

presented that would support your request that A████ not be required to abide by the
remainder of the dress code or any other rule put in place by NISD, which does not
speak to any requirement that A████ cut his hair, as any other NISD student.   In
amending the dress code for A████ and requiring him, while at school and at school
events, both at home and away, including the bus, to wear his hair in a tightly woven
single braid down his back, with the hair behind his ears and the braid tucked into the
collar of his shirt, Adriel is in full compliance with the dress code as his hair would
remain out of the eyes, would not cover any part of the ear or touch the top of the
standard collar in the back as mandated by the NISD dress code and applied to all
NISD students.  Additionally, by complying with this amended dress code, A████ is not
required to choose between his religious beliefs, that he not cut his hair, and complying
with the rules put in place by NISD to teach all students hygiene, instill discipline,
prevent disruption, avoid safety hazards, and assert authority.

        Again, you, A████, and his parents are well aware of the dress code and
its provisions and will be required to follow them, as amended for A████, as would any
other student attending NISD.  As stated in previous correspondence, A████ has been
given the same grace period that would be given to any other NISD student, until
September 2, 2008, before teachers and administrators begin imposing discipline for
any failure to comply, in accordance with the Student Code of Conduct, for a violation of
any provision of the dress and grooming code. It is now September 3, 2008, and as you
have stated repeatedly in your correspondence, A████ has come to school for a full
week out of compliance with the dress code.  Please accept this correspondence as
notice that, as of today, discipline may be and will be applied in accordance with the
Student Code of Conduct for all rule violations including dress and grooming code
infractions.    Should a violation be observed, A████'s parents will be notified by the
school of any discipline being imposed.

        As we have stated previously, the dress code applies to all NISD students
uniformly in requiring that all students come to school looking clean and neat, wearing
clothing, and exhibiting grooming that will not be a health and/or safety hazard to the
student or others or that which may reasonably be expected to interfere with normal
school operations.  We have made a specific accommodation for A████'s religious
beliefs with regard to the particular provision that may have burdened his exercise of
A████'s  religious beliefs that he keep his hair uncut, but A████ must still be held to
those provisions of the dress code that do not conflict with his religious belief.  We will
not waive A████s compliance with other NISD policies that do not conflict with his belief
that his hair not be cut, nor do we believe this is reasonable.

        If you have any questions, please do not hesitate to contact myself or Rhonda
Crass, however, please be advised that Ms. Crass is in meetings until mid-afternoon.

09/03/2008 10:09 FAX  7135521697          Henslee Fowler Hepworth                    Ø004/004

HENSLEE SCHWARTZ LLP
ACLU
September 3, 2008
Page 3

Very truly yours,

Kristen Z. Foster

Cc:    Rhonda Crass (internal)

Curtis Rhodes, Superintendent                                    *Via email*
Jeanna Sniffin, Elementary School Principal                       *Via email*
Needville Independent School District

EXHIBIT 11

AUG-22-2008 FRI 05:18 PM Hepworth & Schwartz          FAX NO. 817 810 0811          P. 01

# HENSLEE SCHWARTZ LLP

### ATTORNEYS AT LAW

306 W. 7TH STREET
SUITE 1045
FT. WORTH, TEXAS 76102          AUSTIN • DALLAS • FT. WORTH • HOUSTON • SAN ANTONIO

PHONE: (817)810-0717
TOLL FREE: (866) 810-0717
FAX: (817) 810-0811

**RHONDA C. CRASS**
Equity Partner
rcrass@hensleeschwartz.com

August 22, 2008

Lisa Graybill                          ***Via Facsimile: (512) 478-7303***
Legal Director                         ***Via U.S. Mail***
Fleming Terrell
Staff Attorney
ACLU Foundation of Texas
P. O. Box 12905
Austin, TX 78711-2905

     Re:    Needville ISD – A▆▆▆ A▆▆▆▆

Dear Ms. Graybill and Ms. Terrell:

       This letter is in response to your inquiry to Ms. Foster as to whether Needville ISD would refrain from applying the NISD Elementary School dress and grooming code to A▆▆▆ A▆▆▆▆ until the prior of September 22, 2008 or a district court's denial of your client's motion for a preliminary injunction. We have conferred with the Superintendent of NISD and at this time would like to set forth our position to avoid any confusion. Please understand that our agreement to refrain from applying the dress and grooming code to A▆▆▆ until either September 22, 2008 or until a district court could rule on a motion filed by you was put in place in order to give a reasonable amount of time to allow your clients to pursue potential judicial remedies only <u>if,</u> per your correspondence of August 14, 2008, *"NISD d[id] not grant A▆▆▆ an exemption by August 20, 2008."*

       As you are certainly aware as you were present and have received correspondence reflecting the same, at the regularly scheduled Board meeting on August 20, 2008, the Board heard your Level III grievance presentation that A▆▆'s religious beliefs mandate that his hair not be cut as well as the presentation of the NISD Superintendent on behalf of the Administration. The Board determined, based on the record that the exemption to the dress code requested would, for the 2008-2009 school year, be granted in that A▆▆ not be required to cut his hair because of the religious beliefs cited by his parents. However, the Board did determine that A▆▆'s religious beliefs were amply addressed and remedied by this exemption tailored to his needs and

ACLU
August 22, 2008
2

A████ would be required to abide by the remainder of the dress code as any other NISD student.   The Board determined that these two goals could be met while requiring A████ while at school and at school events, both at home and away, including the bus, to be required to wear his hair in a tightly woven single braid down his back, with the hair behind his ears and the braid tucked into the collar of his shirt.  As such, the hair would remain out of the eyes, would not cover any part of the ear or touch the top of the standard collar in the back as mandated by the NISD dress code and applied to all NISD students.

Because the NISD Board did grant A████'s request for an exemption to the dress and grooming code that addressed his desire to refrain from cutting his hair, we see no reason to apply a "grace period" by which the dress code would not be applied to A████ until September 22, 2008, nor are we amenable to such an arrangement.  Rather, A████ and his parents are well aware of the dress code and its provisions and will be required to follow them, as amended for A████, as would any other student attending NISD.  We are willing to grant A████ the same grace period that would be given to any other NISD student who is becoming familiar with the dress code, that is for the first week after the first day of school -- in this case, until September 2, 2008 -- before teachers and administrators will begin noting any failure to comply and discipline may be imposed, in accordance with the Student Code of Conduct, for a violation of any provision of the dress and grooming code.

During your conference with Ms. Foster earlier today, you also indicated that you wished to keep this September 22, 2008 "grace period" as you have tried to be cooperative by not calling the press or media for the week of August 14, 2008 through August 20, 2008 during which we were working to have your grievance heard before the Board.  Please understand that the lack of media attention was intended to serve both NISD as well as A████ equally.  Your clients have expressed that their religious belief not to cut their son's hair is intensely personal and we have indicated that media presence at an elementary school would most certainly add to the stress already present during all children's first days of kindergarten, including A████'s.  As such, we do not view your refraining from contacting the media during a one week period as motivation to continue an unrelated "grace period" which is moot.  If your clients are now determined to contact the media, despite the effect it will have on this issue remaining "personal and private," in order to express their dissatisfaction that the NISD Board granted their religious exemption, they will likely do so despite it being potentially severely distracting to A████ and the other students of NISD beginning school next week.

You have indicated that your clients are disappointed with the Board's granting of the exemption.  In addressing your concerns, we want to start by reiterating your position which was communicated to us in your July 29, 2008 correspondence wherein you requested an exemption for A████ to the hair length policy specifically.  You have also subsequently stated to us, as well as NISD's Superintendent and Board that the religious belief to which A████ subscribes mandates that he be allowed to have long hair and that his hair not be cut.  In stating that A████'s hair not be required to be cut, the Board has implemented a remedy to any substantial burden that the NISD dress and grooming code had on A████'s religious exercise by removing the requirement that

ACLU
August 22, 2008
3

he cut his hair.  Now, it appears that you are stating that while the burden on his religion has been removed by the Board's granting of an exemption, A█████ and his parents do not feel that NISD should be able to apply any provision of the dress code to A█████ simply because his religious belief is that he not cut his hair.  We are confused by this claim and frankly do not believe your position is supported by the law.

        You stated yourself in your presentation to the Board on August 20, 2008 that you had no argument with the NISD dress and grooming policy itself as generally dress and grooming codes in a public school context are constitutional.  Your argument, you stated at that time, was that policy provisions conflicted with A████'s religious beliefs that he not cut his hair.  These conflicts have been addressed and remedied by the Board.  Yet, still you state that you have an issue with NISD's decision to apply to A████ a specifically amended dress and grooming code that does not conflict with A████'s religious belief that his hair cannot be cut.  You allege that NISD cannot impose any restrictions as to how A████'s hair will be worn.  We have never been presented with any argument or authority supporting that A████'s religion requires that he be permitted to wear his hair in any fashion that he might wish.  Again, we have only been told that his religion does not allow for his hair to be cut and we have made accommodations for this belief.  You have indicated that you are particularly concerned with our request that A████ tuck the tail of his braided hair inside his shirt collar, but other than a blanket representation that you do not wish to abide by this request, you have not indicated that this would be violative of A████'s religious beliefs that his hair remain uncut.  As such, we do not understand your complaint with this request to be based in religious belief and instead, interpret it to be simply a disagreement with a secular policy that does not put a substantial burden on A████'s religious belief that his hair remain uncut.

        NISD's dress code is in place to teach all students hygiene, instill discipline, prevent disruption, avoid safety hazards, and assert authority.  The dress code applies to all NISD students uniformly in requiring that all students come to school looking clean and neat, wearing clothing, and exhibiting grooming that will not be a health and/or safety hazard to the student or others or that which may reasonably be expected to interfere with normal school operations.  We have made an accommodation for A████'s religious beliefs with regard to the particular provision that may have burdened his exercise of A████'s religious beliefs that he keep his hair uncut, but A████ must still be held to those provisions of the dress code that do not conflict with his religious belief.  We will not excuse A████ for wearing a shirt longer than shorts or for wearing his hair in his eyes, as prohibited by the NISD Elementary school dress code any more than we would excuse A████ for being tardy to class just because he has demonstrated that he has a religious belief that he not cut his hair.  If an NISD policy or rule does not speak to the length of A████'s hair, as the vast majority do not, then there is no religious reason for an exemption to those policies about which we are aware.  If your position is that A████'s religious beliefs that he not cut his hair now additionally mandate that he be permitted to wear his hair not only uncut but also in the fashion of his choice, we would invite you to present this argument to the Board, but at this time, no such argument has been made.  The Board has reasonably and amply addressed and granted your request for an exemption based only on Adriel's reported religious belief that his hair not be cut.  This exemption granted on these limited grounds does

ACLU
August 22, 2008
4

not have the effect of waiving A████'s compliance with other NISD policies that do not conflict with his belief that his hair not be cut, nor do we believe this is reasonable.

The Fifth Circuit in *Karr v. Schmidt*, 460 F.2d 609 (5th Cir. 1972), held that there is no constitutionally protected right to wear one's hair in a public school in the style that suits the wearer.[1] Further, the Fifth Circuit in *Karr* was clear in finding that the communicative content to entitle wearing of a certain hair style to First Amendment free speech protection was "doubtful."[2]  Also, under the analysis applied by the United States Supreme Court in *United States v. O'Brien*, a school can regulate the nonspeech conduct of its students, such as their appearance and dress, even though there is an incidental limitation on speech if 1) the regulation in question is within the government's constitutional power; 2) the regulation in question furthers an important or substantial governmental interest; 3) the government interest is unrelated to the suppression of free expression; and 4) the incidental restriction of the expression is no greater than necessary to further that state interest.[3]  The establishment of a dress code is a proper function of a school board.[4]  Additionally, interests in the health, safety, and order of public schools, such as are contemplated and addressed by the NISD dress and grooming code, are sufficient government interests under *O'Brien*.[5]  Third, the NISD dress and grooming code, as indicated by the code itself, was adopted for other legitimate reasons unrelated to the suppression of student expression, such as to teach hygiene, instill discipline, prevent disruption, avoid safety hazards, and assert authority.[6] Further, we do not believe that the dress code, as amended for A████ per the request of A████ and his parents, restricts Adriel's expression in any way, let alone in a way that is greater than necessary to further NISD's interest in promoting hygiene, instilling discipline, preventing disruption, avoiding safety hazards and asserting authority.

We hope you understand that we and the Board believe that we heard your grievance requesting a religious exemption to the NISD dress and grooming policy clearly and we took your statements seriously.  In granting A████ an exemption that would allow him to keep his hair uncut, the Board at NISD truly believes they have accommodated A████'s religious beliefs.  By still requiring that A████'s hair be braided, be worn behind his ears, and that the tail be tucked inside his shirt collar so as not to touch the top of the collar, we believe we have amended the dress and grooming code for A████ enough to remove any substantial burden on his religious beliefs while simultaneously maintaining the purpose of the NISD dress and grooming code and its many other provisions that created no burden on A████'s religious belief that his hair remain uncut.  In this way, we are only requiring that A████ follow the same rules and policies that apply to all other NISD students with deference being specifically given to

---

[1]     *Karr v. Schmidt*, 460 F.2d 609, 613 (5th Cir. 1972).
[2]     *Id.*
[3]     *U.S. v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed. 2d 672 (1968).
[4]     *See Karr v. Schmidt*, 460 F.2d 609, 613 (5th Cir. 1972); *Menora v. Illinois High School Ass'n*, 683 F.2d 1030 (7th Cir. 1982), *cert. denied*, 459 U.S. 1156, 103 S.Ct 801, 74 L.Ed.2d 1003 (1983); *Hatch v. Goerke*, 502 F.2d 1189 (10th Cir. 1974).
[5]     *See U.S. v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed. 2d 672 (1968); *Littlefield v. Forney Indep. Sch. Distr.*, 268 F.3d 275, 286 (5th Cir. 2001).
[6]     *See Littlefield v. Forney Indep. Sch. Distr.*, 268 F.3d 275, 286 (5th Cir. 2001); *Canady v. Bossier Parish Sch. Board*, 240 F.3d 437 (5th Cir. 2001).

AUG-22-2008 FRI 05:21 PM Hepworth & Schwartz          FAX NO. 817 810 0811          P. 05

ACLU
August 22, 2008
5

his religious belief, as communicated to us, that his hair not be cut. We hope that after careful consideration, you will agree that we have accommodated A████'s specific religious belief, as requested and required. Our hope is that you can accept the Board's decision, which was reasonable and responsive to your requests, so that we can all the 2008-2009 school year cooperatively.

However, to be very clear on the District's position should A████ fail to comply with the provisions made in providing the exemption, the administration at Needville ISD grants a "grace" period for compliance with the dress and grooming code during the first week of school while students and parents familiarize themselves with the specifics of the policy. Because the Board of Trustees has granted the exemption to A████ not to cut his hair, the District can't provide an "extended grace" period when we have done as you requested. If A████ or his parents choose not to abide by the exemption granted as stated at the board meeting on Wednesday, August 20, 2008, the administration will begin their discipline process as outlined in the Student Handbook on Tuesday, September 2, 2008 for not only A████ but all students who choose to be non-complaint.

If you have any questions, please advise.

Very truly yours,

Rhonda Crass
Rhonda Crass

Cc:    Kristen Foster (internal)

Curtis Rhodes, Superintendent                                          *Via email*
Beth Brisco, Assistant Superintendent                                  *Via email*
Needville Independent School District
16277 Highway 36 South
Post Office Box 412
Needville, Texas 77461

# EXHIBIT 12



**J A Y S**

# Needville Independent School District

16227 HIGHWAY 36 • P.O. BOX 412 • NEEDVILLE, TEXAS 77461 • 979-793-4308 • FAX: 979-793-3823

August 25, 2008

Michelle Betenbaugh
16916 Brumbelow Rd.
Needville, Texas 77461

*Via Hand Delivery* (sent home with student)
*Via CM/RRR # 70062150000322496216*

RE:  Dress and Grooming Code

Dear Ms. Betenbaugh:

As you are aware, the Needville ISD Board of Trustees on August 20, 2008 granted your student an exemption to the 2008-2009 dress and grooming code provision regarding the length of your student's hair.  Therefore, please accept this correspondence as notice of supplement, specific to your child's needs, to the NISD Elementary School Dress Code and NISD Student Code of Conduct which your student will bring home today for you to read, sign and return to school with your student.  Please be aware that your student will still be required to abide by the remaining provisions of the dress and grooming code as any other student.

The exemption granted to your student for the 2008-2009 school year may be reapplied for each school year by requesting, from the Administration office, and filling out the Request for Exemption form.  This granted exemption will mean that your student, for the 2008-2009 school year, will not be required to cut his hair because of his religious beliefs.  However, while at school and at school events, both at home and away, including the bus, your student will be required to wear his hair in a tightly woven single braid down his back, with the hair behind his ears and the braid tucked into the collar of his shirt so as to comply with the other provisions of the dress and grooming code regarding students' hair while not affecting your student's previously noted religious beliefs relating to the length of his hair.

REACHING FOR NEW HEIGHTS OF EXCELLENCE!

| Elementary School | Intermediate School | Middle School | Junior High School | High School |
|---|---|---|---|---|
| 979-793-4241 | 979-793-5300 | 979-793-3027 | 979-793-4250 | 979-793-4158 |

As with any other student beginning school with NISD, there is a limited time period we allow for parents and students to familiarize themselves with the dress and grooming code and to come into compliance. As such, no disciplinary measures will be taken regarding violations of the dress and grooming code for the first week of school. However, beginning on September 2, 2008, teachers and administrators will begin noting any failure to comply with the provisions of the dress and grooming code as amended for your student, and discipline will be imposed, in accordance with the Student Code of Conduct, for a violation of any provision of the dress and grooming code at that time. Violations will be viewed as insubordination, per the Student Code of Conduct, and discipline, including in-school-suspension, will follow any repeated violation of the dress code.

We hope this correspondence will aid in clearing up any potential for confusion in the weeks to come. If you have questions, please let us know.

Very truly yours,

Jeanna Sniffin,
Needville Elementary Principal

Cc:        Rhonda Crass– via email
           Beth Briscoe – via email
           Kristen Foster – via email
           Curtis Rhodes- via email

EXHIBIT 13

**Fleming Terrell**

**From:**    rcrass@hensleeschwartz.com
**Sent:**    Monday, September 01, 2008 10:01 PM
**To:**       Fleming Terrell
**Subject:** Re: A█████ attendance

Fleming,
My email is down at home so my blackberry msg is short. Failure to comply will result in ISS and notification to parents until compliance. I will call you on Tuesday.

Sent via BlackBerry by AT&T

**From**: "Fleming Terrell" <FTerrell@aclutx.org>
**Date**: Mon, 1 Sep 2008 21:25:05 -0500
**To**: <rcrass@hensleeschwartz.com>
**CC**: Lisa Graybill<LGraybill@aclutx.org>
**Subject**: A████ attendance

Dear Ms. Crass,

Thank you for taking time to talk to Lisa and me earlier today, despite the holiday.  As we discussed, our clients intend for A████ to go to school with his hair in two braids, as he wore it last week; we understand that your client intends to discipline A████ if he does so.  We will look forward to receiving your confirmation about how and when your client will discipline A████ so that we can minimize any negative impact on both the school and A████.

In addition, after we spoke today, we learned that A████ has become ill and likely will not be well enough to attend school on Tuesday.  We wanted to notify you about his likely absence in order to avoid any confusion, and to confirm what information his parents must provide the school in order to have an absence caused by illness excused.  You can reach me at the number below tomorrow morning, or Lisa at the same line, extension 116, should you wish to discuss this further by phone.

Many thanks,

Fleming Terrell
Staff Attorney
ACLU Foundation of Texas
611 Congress Ave., Suite 320
Austin, TX 78704
Tel. 512-478-7300 x 128
Fax. 512-478-7303
www.aclutx.org

This communication is for use by the intended recipient and contains information that may be privileged, confidential or copyrighted under applicable law. If you are not the intended recipient, you are hereby formally notified that any use, copying or distribution of this communication, in whole or in part, is strictly prohibited. Please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy. This communication does not constitute consent to the use of sender's contact information for direct marketing purposes or for transfers of data to third parties.

The views and opinions expressed in this communication do not necessarily reflect the official positions of the staff, management and directors of the American Civil Liberties Union, the American Civil Liberties Union Foundation, its affiliates, or its chapters.

EXHIBIT 14

*The school-to-prison pipeline needs to be better defined and redirected toward greater opportunities for all youth.*

# Defining and redirecting a school-to-prison pipeline

*Johanna Wald, Daniel J. Losen*

THE PUBLIC SCHOOL SYSTEM in the United States, like the country as a whole, is plagued by vast inequalities—that all too frequently are defined along lines of race and class. Students in high-poverty, high-minority schools are routinely provided fewer resources, fewer qualified teachers, and fewer advanced-level courses than their more affluent white peers.[1] Not surprisingly, they experience lower rates of high school graduation, lower levels of academic achievement, and higher rates of college attrition.

Recent policy trends appear to be intensifying these inequalities. The end of court-ordered and voluntary school desegregation plans in many jurisdictions has contributed to the steady resegregation of black and Latino students in public schools for over fifteen years. The proliferating use of high-stakes tests is increasing the numbers of students—disproportionately minority—held back in grade and denied high school diplomas for failure to pass one or a set of state-mandated exams. Official dropout rates often dramatically under-estimate high school completion rates and mask a widening graduation gap between minority and white students. In the one hundred largest cities in the United States, 58 percent or more of

NEW DIRECTIONS FOR YOUTH DEVELOPMENT, NO. 99, FALL 2003 © WILEY PERIODICALS, INC.

ninth-grade students in high-minority schools do not graduate four years later.[2]

A related educational trend that is proving to be particularly problematic for minority students involves school discipline. Since the early 1990s, many school districts have adopted a zero-tolerance approach to school code violations. The result is a near doubling of the number of students suspended annually from school since 1974 (from 1.7 million to 3.1 million),[3] an increase in the presence of police in schools, and the enactment of new laws mandating referral of children to law enforcement authorities for a variety of school code violations.

Minorities are heavily overrepresented among those most harshly sanctioned in schools. Nationally, black students are 2.6 times as likely to be suspended as white students.[4] In 2000, they represented 17 percent of the student population but 34 percent of those suspended.[5] As the number of overall suspensions has increased over time, so have the racial disparities. Between 1972 and 2000, the percentage of white students suspended annually for more than one day rose from 3.1 percent to 5.09 percent. During the same period, the percentage for black students rose from 6.0 percent to 13.2 percent.[6]

This get-tough approach to discipline in schools is mirrored in the treatment of youths in the criminal justice system. Since 1992, forty-five states have passed laws making it easier to try juveniles as adults, and thirty-one have stiffened sanctions against youths for a variety of offenses.[7] Despite a precipitous drop in juvenile crime during the last half of the 1990s, the number of formally processed cases involving juveniles—most of them nonviolent cases—increased, along with the number of youths held in secure facilities for nonviolent offenses.[8]

The racial disparities among those most severely sanctioned by these new laws and policies are startlingly similar to those found in student discipline data. In 1998, black youths with no prior criminal records were six times, and Latino youths three times, more likely to be incarcerated than whites for the same offenses.[9] While comprising one-third of the country's adolescent population, they represented two-thirds of all youths confined to detention and correctional placements.[10] Four out of five new juveniles detained between 1983 and 1997 were youths of color.[11]

In fact, the racial disparities within the two systems are so similar—and so glaring—that it becomes impossible not to connect them. Many observers, advocates, and educators have done so, crafting terms such as *prison track* and *school-to-prison pipeline* to describe these dual trends. Such phrases depict a journey through school that becomes increasingly punitive and isolating for its travelers. Many will be taught by unqualified teachers, tested on material they never reviewed, held back in grade, placed in restrictive special education programs, repeatedly suspended, and banished to alternative out-placements before dropping or getting pushed out of school altogether. Without a safety net, the likelihood that these same youths will wind up arrested and incarcerated increases sharply.

Adult prisons and juvenile halls are riddled with children who have traveled through the school-to-prison pipeline. Approximately 68 percent of state prison inmates in 1997 had not completed high school.[12] Seventy-five percent of youths under age eighteen who have been sentenced to adult prisons have not passed tenth grade. An estimated 70 percent of the juvenile justice population suffer from learning disabilities, and 33 percent read below the fourth-grade level.[13] The single largest predictor of later arrest among adolescent females is having been suspended, expelled, or held back during the middle school years.[14]

Yet despite the strong relationships that exist between troubled educational histories and subsequent arrest and incarceration, the specific ways in which schools may either contribute to or prevent the flow of students into the criminal justice system remains largely unexplored. Given the growing overall numbers of prison inmates—now at a record 2.1 million—in the United States, along with the glaring racial disproportionality within this population, achieving a more accurate and complete understanding of these relationships is urgent.

This urgency is underscored by the fiscal crisis facing most states. Between 1980 and 2000, state spending on corrections nationwide grew at six times the rate of state spending on higher education, with predictable consequences in terms of racial disparities. According to the Justice Policy Institute, there were

almost a third more African American men in prison and jail (791,600) than in universities or colleges (603,000) at the end of the twentieth century.[15]

As many legislators now confront the need to make drastic cuts in state and local budgets, they desperately need information about how targeted investments in education can reduce expenditures in corrections. For example, several recent studies suggest that schools that engage and hold onto their students can serve as powerful deterrents to delinquency. The surgeon general's report on youth violence, released in January 2001, found that commitment to school was one of only two protective buffers against specific risk factors for violence.[16] A study released in 2002 found that school connectedness, defined as a student's feeling part of and cared for at school, is linked with lower levels of substance use, violence, suicide attempts, pregnancy, and emotional distress.[17]

The research presented in this issue represents, to the best of our knowledge, the first attempt to examine this complex issue systematically. These studies were originally presented at a conference on the school-to-prison pipeline sponsored by the Civil Rights Project at Harvard University and the Institute on Race and Justice at Northeastern University in May 2003. The goals were to (1) begin to methodically deconstruct the pipeline by identifying specific patterns, practices, and indicators along the continuum and (2) generate discussion, strategies, and policies for how this pipeline could be redirected toward greater opportunity for its travelers.

The authors of the studies contained in this issue have uncovered some provocative and interconnected themes that should give policymakers, educators, juvenile justice officials, civil rights, and other advocates serious pause. They provide clear evidence of dysfunctional systems that not only fail to serve the neediest children but in fact, as several studies powerfully illustrate, create conditions that exacerbate the harm inflicted on them. The studies in this issue have major findings, including these:

- *Failure to provide appropriate behavioral interventions may be contributing to delinquency among students with disabilities.* Minority students with disabilities, and especially poor black males, are at

greatest risk for being suspended repeatedly in a single school year, raising serious questions about the adequacy of behavioral supports that are being provided. This finding is particularly relevant today as Congress considers the elimination of due process protections for students with disabilities who are facing long-term suspension or expulsion.

Many schools employ preventive detention, a policy that excludes students from school for their perceived potential to be dangerous rather than for any overt act they may have committed. This policy may function as a form of racial profiling in schools, whereby students of color are disproportionately selected among those singled out for this type of punishment.

Juvenile and educational systems frequently work at cross-purposes, and this lack of coordination is further harming vulnerable students. Once referred to the juvenile justice system, students often miss multiple days of school to make court appearances, even if their cases are ultimately dismissed. The educational services offered by the juvenile justice system are frequently disconnected from the school system. On the education side, schools rarely offer adequate transition or reentry counseling programs for students who are returning from residential settings, thus increasing the likelihood of further failure for these students.

- *Following removal from school, many students experience enormous difficulty in reentering.* Students returning from long suspensions or expulsions, from residential placements, or from secure facilities are at particular risk of school failure and dropping out. They are often academically behind as a result of missing months or even years of schooling. Some schools may steer them toward alternative programs that do not match their educational goals. In one city, within a year of reenrolling in high school, nearly two-thirds of the first-time ninth graders and over three-fourths of the repeat ninth graders who were incarcerated and returned to school will either withdraw or dropout.
- *Effective interventions and programs that reduce risk and enhance protective factors for youths at risk for delinquency exist.* These have the potential to reduce the human costs of victimization and save tax dollars in both the short and long terms.

These studies clearly suggest that the school-to-prison pipeline is preventable, but harnessing the political will to do so is difficult, as several authors point out. This challenge may well prove to be more formidable than accumulating the knowledge base required to reverse the flow from the school-to-prison pipeline toward the school-to-graduation-to-postsecondary-education pipeline. Placing pressure on leaders to move beyond the simplistic rhetoric of zero tolerance and getting the "disruptive kids out of class" to address these complex problems and glaring racial disparities with compassion, care, knowledge, and determination will not be easy. We hope that these studies will help to convince them and others that in the long run, doing so will result not only in dollars saved but in lives salvaged and tragedies derailed.

### Notes

1. Brennan, J. (Ed.). (2002). *The funding gap*. Washington, D.C.: Education Trust.

2. Balfantz, R. (2003). *Urban high schools and racial disparities in holding power*. Working paper.

3. U.S. Department of Education. Office of Civil Rights. (2000). *Elementary and secondary school survey, National and state projections*. Washington, D.C.: U.S. Government Printing Office. Data are from the 2000–01 school year. School and district data from this report are available on-line: www.ed.gov/offices/OCR/data.html.

4. This ratio was calculated by first dividing the number of students of each racial group who were suspended by their total enrollment. That number represents the percentage of risk of suspension for members of that group. Next, using simple division, the risk of one group can be compared to that of any other.

5. U.S. Department of Education. Office of Civil Rights. (2000).

6. U.S. Department of Education. Office of Civil Rights. (2000).

7. Snyder, H., & Sickmund, M. (1999). *Juvenile offenders and victims: 1999 national report*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

8. Stahl, A., Finnegan, T., & Kang, W. (2002). *Easy access to juvenile court statistics: 1985–2000*. Available on-line: http://ojjdp.ncjrs.org/ojstatbb/ezajcs/; Harms, P. (2002). *Detention in delinquency cases, 1989–1998*. Washington, D.C.: Office of Juvenile Justice Prevention, National Criminal Justice Reference Service.

9. Poe-Yamagata, E., & Jones, M. (2000). *And justice for some*. Washington, D.C.: Building Blocks for Youth.

10. Poe-Yamagata & Jones (2000).

11. Hoyt, E., Schiraldi, V., Smith B., & Zeindenberg, J. (2002). *Reducing racial disparities in juvenile detention*. Baltimore, MD: Annie E. Casey Foundation.

12.  *Facts about prisons and prisoners* (Briefing Fact Sheet 1035). Washington, D.C.: Sentencing Project.

13.  *Abandoned in the back row: New lessons in education and delinquency prevention.* (2001). Washington, D.C.: Coalition for Juvenile Justice.

14.  *Justice by gender.* (2001). Washington, D.C.: American Bar Association and the National Bar Association.

15.  Zeiderberg, J., & Schiraldi, V. (2002). *Cellblocks or classrooms? The funding of higher education and corrections and its impact on African American men.* Washington, D.C.: Justice Policy Institute.

16.  U.S. Surgeon General. (2001). *Youth violence: A report of the Surgeon General.* Washington, D.C.: U.S. Department of Health and Human Services.

17.  McNeely, C. A., Nonnemaker, J. M., & Blum, R. W. (2002). Promoting student connectedness to school: Evidence from the National Longitudinal Study of Adolescent Health. *Journal of School Health, 72*(4), 138–147.

JOHANNA WALD *is senior development/policy analyst for the Civil Rights Project at Harvard University.*

DANIEL J. LOSEN *is a legal and policy research associate with the Civil Rights Project at Harvard University.*

EXHIBIT 15

By Certified Mail, Return Receipt Requested

September 4, 2008

Curtis Rhodes
Superintendent
Needville Independent School District
16227 Highway 36 South
Needville, TX 77461

Dear Superintendent Rhodes:

I am giving you notice under Tex. Civ. Prac. & Rem. Code Ann. § 110.006 that my son A██
A████'s free exercise of religion is substantially burdened by Needville ISD's exercise of its
authority to discipline him for not complying with the Board of Trustees' decision that "while at
school and at school events, both at home and away, including the bus," A████ must "wear his
hair in a tightly woven single braid down his back, with the hair behind his ears and the braid
tucked into the collar of his shirt" and reapply for a religious exemption from the normal dress
code every year.  Two days after the Board's decision, your lawyers informed mine that you
planned to discipline A████ for not following the new rule beginning with the second week of
school, and yesterday, you did so by taking him away from his class and putting him in in-school
suspension.

We have raised A████ as American Indian pursuant to his father's heritage and our family's
beliefs.  He keeps his uncut hair in two long braids as part of his religion and expression of his
cultural heritage and identity.  Beginning nearly a year ago, in November 2007, I repeatedly
asked for an exemption from your dress code so A████ could continue this practice.  He is
substantially motivated to do this by sincere religious belief.

Despite finally acknowledging, at its August 20 meeting, that A████'s religious belief about his
long hair is sincere, the Board adopted the new policy that you wrongly call an "exemption."
Forcing a five-year-old child to stuff a 13-inch braid of thick, wavy hair down his shirt and ensure
that all of his hair stays "tightly woven" and under his shirt during a typical kindergartener's day of
activities, study and recreation is not an exemption.  It is a punishment and it is hard to imagine
how anyone, especially a child, could perceive it as anything but. It is degrading, extremely
uncomfortable especially in our very hot climate, and impractical.  It serves no purpose I can
imagine other than to make him ashamed and/or resentful of his own and our family's heritage
and beliefs.   Moreover he, and we, have to come before you every year and endure the
demeaning process of justifying his religious beliefs to you with no guarantee that they will be
respected.

You originally agreed not to discipline A████ until we had time to work this out or ask a court to
help us resolve this.  Yesterday, you placed him in In-School Suspension.

You are placing us, his parents, in the untenable position of choosing between our, and his,
religious beliefs and identity and his education.   Your refusal to exempt him from the dress code
as we requested substantially burdens his free exercise of religion.

Sincerely,

Michelle Betenbaugh

cc:   Rhonda Crass (rcrass@hensleeschwartz.com)
      Kristin Zingaro Foster (kfoster@hensleeschwartz.com)
      by email from my attorneys

EXHIBIT 16



### ATTORNEYS AT LAW

3200 S.W. FREEWAY
SUITE 1200
HOUSTON, TEXAS 77027     AUSTIN • DALLAS • FT. WORTH • HOUSTON • SAN ANTONIO

PHONE: (713) 552-1693
TOLL FREE: (877) 552-
1693 FAX: (713) 552-1697
www.hensleeschwartz.com

**Kristen Z. Foster**
**Associate**
kfoster@hensleeschwartz.com

September 9, 2008

Michelle Betenbaugh
c/o
Lisa Graybill                                    *Via Facsimile: (512) 478-7303*
Legal Director                                   *Via U.S. Mail*
Fleming Terrell
Staff Attorney
ACLU Foundation of Texas
P. O. Box 12905
Austin, TX  78711-2905

      Re:   Needville ISD – A▮▮▮ A▮▮▮▮

Dear Ms. Betenbaugh:

      This letter is in response to your September 4, 2008 correspondence.  In your letter, you purport to give notice under Tex. Civ. Prac. & Rem. Code Ann. §110.006 of your belief that your son's free exercise of religion is being substantially burdened by NISD's application of its dress and grooming code as amended specifically to accommodate  your son's religious beliefs as presented to NISD's Board of Trustees.

      Your requested exemption from the NISD dress code was heard and granted on August 20, 2008. You requested an exemption on the grounds that your son's religion mandated that he not be required to cut his hair.  After hearing your request for an exemption, the NISD Board of Trustees granted an exemption stating that your son would not be required to cut his hair in order to comply with the NISD dress code.  The exemption further stated, in an effort specifically to remove the appearance of any substantial burden on your son's religious exercise in complying with the remainder of the NISD dress code that does not speak specifically to hair length, that by your son's wearing of his hair at school and school-sponsored events in a tightly woven single braid down his back with the hair tucked behind his ears and the braid tucked in the collar of his shirt, he would be in full compliance with the NISD dress code and not be required to cut his hair.

HENSLEE SCHWARTZ LLP
September 9, 2008
Page 2

Your son's religious beliefs, as you presented them, were amply addressed and remedied by the granted exemption to the dress and grooming code and was specifically tailored to his need that he not be required to cut his hair. In amending the dress code with your son's religious beliefs specifically in mind, your son can now comply with the dress code, as do all other NISD students. Any perceived substantial burden to his religious beliefs has been removed as your son's hair is not required to be cut under this exemption. In enacting this amended dress and grooming code policy for your son after hearing your religious basis for an exemption, NISD has implemented a remedy that reasonably removes the substantial burden on your son's free exercise of religion as presented to the district and to the Board. See Tex. Civ. Prac. & Rem. Code §110.006(d).

You now complain that we "originally agreed not to discipline [your son] until we had time to work this out or ask a court to help us resolve this...." Our correspondence of August 22, 2008 and September 3, 2008, clearly demonstrates that our previous communications in which a "grace period" regarding discipline for failure to comply with the dress code was discussed was not "unconditional," but based on a request from you that we allow you time to bring your complaint before a Court if, per your counsel's correspondence of August 14, 2008, "NISD d[id] not grant Adriel an exemption by August 20, 2008." The NISD Board of Trustees did grant your exemption request that your son not be required to cut his hair in accordance with his religious beliefs. Therefore, because an exemption was granted by August 20, 2008, which exemption does not require your son to violate his religious beliefs in order to comply with the amended dress code, there is no practical reason to refrain from applying this amended dress code to your son.

In adhering to this amended dress code, your son is not required to choose between his religious belief that he not cut his hair, and complying with the rules put in place by NISD to teach all students hygiene, instill discipline, prevent disruption, avoid safety hazards and assert authority. The NISD dress code applies to all NISD students uniformly in requiring that all students come to school looking clean and neat, wearing clothing, and exhibiting grooming that will not be a health and/or safety hazard to the student or others or that which may reasonably be expected to interfere with normal school operations. We have made a specific accommodation for your son's religious beliefs with regard to the particular provision that speaks to the length of your son's hair, but your son must still be held to those provisions of the dress code that do not conflict with his religious belief. We will not waive compliance with other NISD policies that do not conflict with your son's belief that his hair not be cut, nor do we believe this is an unreasonable position.

Very truly yours,

Kristen Z. Foster

HENSLEE SCHWARTZ LLP
September 9, 2008
Page 3


Cc:

Curtis Rhodes, Superintendent                                    *Via email*
Needville Independent School District


Rhonda Crass (internal)