UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **A.A., by and through his parents and legal guardians, MICHELLE BETENBAUGH and KENNEY AROCHA; MICHELLE BETENBAUGH, individually; and KENNEY AROCHA, individually,** | § § § § § § | |
| **Plaintiffs,** | § | |
| v. | § § | **CIVIL ACTION NO. H-08-2934** |
| **NEEDVILLE INDEPENDENT SCHOOL DISTRICT,** | § § § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. No. 3) pursuant to Federal Rules of Civil Procedure 65(a). Three evidentiary hearings were held at which both sides presented documentary and testimonial evidence. Having considered the evidence, arguments, and relevant law, the Court finds that Plaintiffs' Motion should be granted in part and denied in part for the reasons stated herein.

### I.      FINDINGS OF FACT

#### A. Plaintiffs' Religious Beliefs

Plaintiffs seek relief from an elementary school's hair style regulation that allegedly burdens their constitutional rights. Plaintiffs Michelle Betenbaugh and Kenney Arocha are married, and they have one son, Plaintiff A.A., who is five years old. (Prelim. Inj. Hr'g Tr., vol. II, 173:1-2, October 22, 2008.) Plaintiff Betenbaugh's relatives purchased land in Needville, Texas, and Plaintiffs decided to move there. They planned to enroll A.A. in Needville Elementary School when he began kindergarten in the fall of 2008. (*Id.* at 186:21-187:6.)

Plaintiff Arocha identifies as Native American. (*Id.* at 173:5-6.) When he was a child, his maternal grandfather and uncle told him he was Native American. (*Id.* at 173:7-10.) The same grandfather and uncle taught him certain beliefs and "gave him tools" to guide him through the day and to help him "better understand his purpose." (*Id.* at 173:5-10.) He bases his religious practices on these teachings. (*Id.* at 177:24-25.) His grandfather wore his hair short, but his uncle wore his hair long and in one or two braids. (*Id.* at 213:1-11.) Plaintiff Arocha wore his hair long as a young child and was forced to cut it when he began school, an experience he describes as "unsettling." (*Id.* at 181: 18-23.) His other family members, including his mother, claim to be Hispanic and practice Catholicism. (*Id.* at 174:3-5; 179:11-16.) Plaintiff Arocha believes that members of his tribe escaped the United States to avoid being placed on reservations and later returned, identifying themselves as Mexican nationals. (*Id.* at 174:13-17.)

As Plaintiff Arocha grew older, he practiced Catholicism, and then Mormonism; neither suited him. (*Id.* at 179:11-18.) Ten to eleven years ago, at Plaintiff Betenbaugh's urging, he began to "reconnect" to his Native American religion and the teachings of his grandfather and uncle. (*Id.* at 179:17-21.) At hearing, he articulated his religious beliefs:

> "What I like to do, I like to have reverence every day to understand that at every turn, no matter what it was, no matter what it is that we're doing, something somewhere had to give itself up for us and to understand that and the pay close attention to that, in order to respect whatever it was that gave itself up for me."

(*Id.* at 175:18-23.) He believes that these values reflect Native American beliefs and are thus connected to his ancestry. (*Id.* at 176:1-4.)

Plaintiff Arocha concedes that his understanding of his religion is incomplete, but he continues to research Native American religion and culture on a daily basis. (*Id.* at 180:14-20.) He has petitioned to join the Lipan Apache tribe (*Id.* at 178:6-8), but he has been unable to collect the required genealogical records. (*Id.* at 174:22-175:13.) He practices smudging, a traditional ritual

that is a form of prayer. (*Id*. at 176:23-177:1). As part of the process of reconnecting with his family's teachings, Plaintiff Arocha also wears his hair long. (*Id*. at 182: 2-5.) He admits that, when he began to grow his hair long, he was not doing so for religious reasons. (*Id*. at 182:8-17.) A common theme of his religious experience, however, has been to discover that "something he has been doing for a long time winds up being something that's more significant." (*Id*. at 184:23-25.) He believes this is because he comes to a better understanding of his grandfather and uncle's teachings on a daily basis. (*Id*. at 185:2-3.) It has been ten to eleven years since he last cut his hair. (*Id*. at 182:1-5.)

Plaintiff Arocha now feels that his hair is "a symbol, an outward extension of who we are and where we come from, our ancestry and where we're going in life. It's a constant reminder to us of who we are." (*Id*. at 181:10-15.) Plaintiff Arocha will not cut his long hair unless he is in mourning for a loved one. (*Id*. at 182:25-183:2.) An employer once threatened to terminate him if he did not cut his hair, but Plaintiff Arocha refused. (*Id*. at 253:8-15.) When he underwent brain surgery, he worked with his doctors to avoid having his hair cut for the procedure. (*Id*. 262:25-263:25.) He does, however, occasionally shave the sides of his head because of the summer heat. (*Id*. at 250: 14-20.) Plaintiff Arocha has not suffered any teasing because of his long hair; instead, people ask him whether he is Native American, and he tells them that he is. (*Id*. at 207:10-14.)

Plaintiff Arocha also finds religious significance in braiding his long hair. (*Id*. at 183:18-19.) He believes that each braid and each plait has a deep meaning, and that the very act of braiding helps him feel connected to who he is. (*Id*. at 183:11-15.) He formed these beliefs regarding his braids after the Needville Board of Trustees ("the School Board") granted A.A. an exemption from its school's grooming policy requiring him to keep his hair covered under his shirt, in one braid. (*Id*. at 217:6-16.)

Plaintiffs Arocha and Betenbaugh have chosen, as parents, to teach A.A. Native American religious principles. (*Id.* at 181:8-15.)  As an example of their teachings, Plaintiff Arocha testified that when A.A.'s horse became ill, they had A.A. lead the horse to the vet to be euthanized so that he could understand that "all things come to an end." (*Id.* at 176:7-22.)  Additionally, A.A.'s hair has never been cut, and he typically wears it in two long braids. (*Id.* at 185:14-18; Pls.' Ex. 4-5.) His parents have explained to him that his hair connects him to his ancestors and is a constant reminder of "how long he has been here and an extension of who he is." (*Id.* at 185:12-14.)  When people ask A.A. why he has long hair, he tells them it is because he is Native American. (*Id.* at 181:5-7.)  Plaintiffs Arocha and Betenbaum have begun to explain to A.A. what the two braids mean. (*Id.* at 185:14-18.)  When Plaintiff Betenbaum bought A.A. a wig as part of a Halloween costume, he refused to wear it because he did not want to cover his braids. (*Id.* at 186:1-4.)

**B.  Plaintiff A.A.'s Enrollment in Needville Independent School District**

Needville Independent School District ("NISD") has 2500 students enrolled in elementary, intermediate, middle, and high school. (Prelim. Inj. Hr'g Tr., vol. I, 10:12-14, Oct. 17, 2008.)  The district has a dress code in place that contains the following provision: "Boys' hair shall not cover any part of the ear or touch the top of the standard collar in the back." (Ver. Compl., Ex. 1.)  The dress code also outlines the punishment for violations:  "For persistent offenses, students will be subject to assignment in ISS, suspension, or assignment to the Needville ISD DAEP" (Ver. Compl., Ex. 1.)  The dress code's self-proclaimed purpose is "to teach hygiene, instill discipline, prevent disruption, avoid safety hazards, and assert authority." (Ver. Compl., Ex. 1.)  Prior to A.A., no student had requested a religious exemption from the dress code in at least 22 years. (Prelim. Inj. Hr'g Tr., vol. II, 295:17-25.)[1]

---

[1] Since A.A. requested an exemption, another student, a Muslim fourth grader, requested an exemption in order to wear a head scarf. Her family offered what NISD considered to be sufficient evidence of their sincere religious belief, and

4

Prior to the family's move to Needville, Plaintiff Betenbaugh first contacted NISD about A.A.'s Native American heritage, and his hair length, via email on November 6, 2007. (Ver. Compl., Ex. 2 at 16.) In that email, she inquired whether, in light of the dress code, A.A.'s hair would be a problem when he began kindergarten, and what documentation would be necessary to prove his heritage. *Id.* The email was directed to Linda Sweeney, the secretary of NISD Superintendent Curtis Rhodes. *Id.* Superintendent Rhodes never received the email (Prelim. Inj. Hr'g Tr., vol. I, 8:7-11), and Plaintiffs did not receive a response. (*Id.* at 187:20-22.)

Plaintiff Betenbaugh next contacted NISD about A.A.'s hair length in an email to Needville Elementary School Principal Jeanna Sniffin dated May 27, 2008. (Ver. Compl., Ex. 2 at 15.) Principal Sniffin responded to Plaintiff Betenbaugh's inquiry by telling her that long hair was not permitted for boys. (*Id.*) Plaintiff Betenbaugh then emailed Superintendent Rhodes directly about the issue, notifying him that A.A. wore his hair long in accordance with Plaintiffs' religious beliefs. (Ver. Compl., Ex. 4.)

Rhodes agreed to meet with Plaintiffs on June 9, 2008, to discuss A.A.'s hair. (Ver. Compl., Ex. 2 at 27.) He requested proof of Plaintiffs' belief that hair should not be cut. Plaintiffs explained that their religious beliefs were passed down orally, and that they could not direct him to a book that said they needed to wear their hair long. (Prelim. Inj Hr'g Tr., vol. II, 189:18-21; 190:1-5.) Plaintiffs gave Superintendent Rhodes copies of court opinions that they believe supported their position, including *Alabama v. Coushatta Tribes of Texas v. Big Sandy School Dist.*, 817 F. Supp. 1319 (E.D. Tex. 1993), a copy of the Native American Freedom of Religion Act, and the results of a DNA test, conducted in 2005, that indicated that Plaintiff Arocha was of Native American descent. (*Id.* at 191:4-7.) They explained to Superintendent Rhodes that, according to their beliefs, hair was

---

her request was granted. (Prelim. Inj. Hr'g Tr., vol. II, 289:5.) She is required to reapply for an exemption every year. (*Id.* at 290:1.)

not to be cut except at life-changing events, and characterized it as "a yardstick of wisdom." (*Id.* at 280.) At one point, Plaintiffs described the decision as "a personal choice" and said that they had asked A.A. whether he wanted to cut his hair before attending school. (*Id.* at 280:8-15.) The meeting lasted approximately twenty minutes. (*Id.* at 329:19-21.)

Superintendent Rhodes denied Plaintiffs' request on June 16, 2008.[2] (Ver. Compl., Ex. 2 at 29.) His written denial gave no explanation for his decision; instead, it informed Plaintiffs about the procedure for appealing his decision to the School Board. (*Id.*) On June 25, 2008, Plaintiffs appealed his decision by filing a Level Three Appeal Notice to the School Board. (Ver. Compl., Ex. 2 at 27.) In that appeal, as their reason for seeking a request, Plaintiffs stated: "We as parents disagree with Mr. Rhodes' decision because our son's hair and its length are a sacred part of the belief system we practice. Cutting hair in order to comply with the dress code is not an option." (*Id.* at 28.)

Prior to the Level Three hearing, the local media became interested in the dispute and interviewed both Plaintiffs and Superintendent Rhodes. An article in the *Houston Press*, dated July 10, 2008, quoted Superintendent Rhodes:

> "I've got a lot of friends that are Native American Indians … and they all cut their hair. We're not going to succumb to everything and just wash away our policies and procedures …. If you want to think we're backwards … no one is asking you to move to Needville and have these opinions invoked on you."

(Ver. Compl., Ex. 5.)

On July 16, 2008, the School Board held an open meeting to discuss Plaintiffs' exemption request. The meeting was "standing room only" and many members of the Needville community voiced their opinions about Plaintiffs' request. (Prelim. Inj. Hr'g Tr., vol. II, 194:16-20.) At the

---

[2] NISD has a three-tiered structure for dealing with dress code exemptions. First, a family requests a Level One exemption from the school principal. If the request is denied, the family can appeal the decision to the Level Two officer, Superintendent Rhodes. If Superintendent Rhodes rejects an exemption request, a family can file a Level Three appeal to the School Board. (Prelim. Inj. Hr'g. Tr., vol. I, 12:1-7.)

public meeting, Plaintiffs Arocha and Betenbaugh both spoke, and they were represented by a member of the American Indian Movement. (*Id*. at 195:1-5.) Superintendent Rhodes then advised the School Board that Plaintiffs' request should be deemed premature since Plaintiffs did not yet reside in the district. (*Id*. at 312:2.) The School Board adopted this position and informed Plaintiffs that, because they did not live within the district's limits, there would be no decision, and they would have to start the process over once they moved into the school district. (*Id*. at 195: 22-25.) There is no official policy requiring a child to live in NISD before a dress code exemption can be decided. (*Id*. at 298:6-11.) In fact, Superintendent Rhodes had previously denied Plaintiffs' Level Two request without informing them that they had to first move into the district. He formed his opinion that the request was premature after his Level Two meeting with Plaintiffs, but he did not inform Plaintiffs of his decision before the July 16th School Board meeting. (*Id*. at 313:1-3.)

Following the meeting, Plaintiffs expedited their efforts to take up residence in Needville. (Prelim. Inj. Hr'g Tr., vol. II, 197:4-6.) On August 7, 2008, NISD formally informed Plaintiffs that they would be required to apply for an exemption from the NISD dress code once A.A. was properly enrolled in the district. (Ver. Compl., Ex. 2 at 20.) This time, Plaintiffs were required to complete NISD's newly created "exemption form." (Prelim. Inj. Hr'g Tr. vol. II, 197:16-21.) On August 8, 2008, Plaintiffs filed a Request for Exemption. In that request, they stated that "A.A. has a sincerely held religious belief -- as do many Native Americans -- that his long hair is not only an expression of his ancestry and heritage, but also a sacred symbol of his life and experience in this world, and that it should be cut only to mark major life events such as the death of a loved one. A.A. has learned these religious beliefs from his father, who shares the same ancestry, heritage, and beliefs." (Ver. Compl., Ex. 2 at 17.) The Request for Exemption also stated that A.A.'s hair had never been cut. (*Id* at 18.) On August 13, 2008, A.A. was effectively enrolled in NISD. (Ver. Compl., Ex. 2 at 11; Prelim. Inj. Hr'g Tr., vol. II, 197:13.)

On August 18, 2008, Superintendent Rhodes denied Plaintiffs' second Level Two exemption request. (Ver. Compl. Ex. 2, 7-8.) On August 19, 2008, Plaintiffs again appealed Superintendent Rhodes' Level Two decision to the School Board by filing a Level Three Appeal Notice. (Ver. Compl., Ex. 2). In the Appeal Notice, Plaintiffs informed the School Board that Plaintiff Arocha is not a member of a particular Native American tribe, but his DNA indicates that he is biologically descended from Native Americans. (*Id.* at 2-3.) The Appeal Notice went on to state that Plaintiff Arocha learned of his Native American heritage through his grandfather and uncle, and that he believes that he is descended from the Lipan Apaches, and that he was collecting the required genealogical records to apply for tribal membership. Finally, it noted that Plaintiff Arocha has not cut his hair in observance of his religious beliefs for ten years, and that A.A.'s hair has never been cut. It stated that Plaintiff Arocha had risked termination rather than comply with an employer's hair length policy, and that he maintained his braids during a month-long stay in the hospital. (*Id.* at 3.)

The second Level Three hearing occurred on August 20, 2008. (Ver. Compl. Ex. 9.) Before the School Board convened, Superintendent Rhodes and Plaintiffs held a meeting, with counsel, to determine whether the parties could resolve the dispute. In that meeting, Superintendent Rhodes learned, for the first time, that Plaintiff Arocha had refused to have his hair cut when he had brain surgery; Superintendent Rhodes found this to be compelling evidence of Plaintiff Arocha's sincerity. (Prelim. Inj. Hr'g Tr., vol. II, 285:3-6.) As a result, he offered to allow A.A. to wear his hair on top of his head, in a bun, as a compromise to prevent him from violating the dress code. (Prelim. Inj. Hr'g Tr., vol. II, 321:17-25.) Plaintiffs rejected this offer.

At the second School Board meeting, Plaintiffs, who were represented by counsel, were allowed to speak. Following their presentation, the School Board went into an executive session and consulted with Superintendent Rhodes. (Ver. Compl., Ex. 9, at 18:13-19.) In that session,

Superintendent Rhodes advocated that, as an accommodation, A.A. be allowed to wear his hair long, "in a tightly woven single braid down his back with the hair behind his ears, out of his eyes and the braid tucked into the collar of his shirt." (Ver. Compl., Ex. 9 at 18: 3-6; Prelim. Inj. Hr'g Tr., vol. II, 286:13-287:25.) Superintendent Rhodes constructed some version of this policy before his meeting with Plaintiffs and their counsel (Prelim. Inj. Hr'g Tr., vol. II, 317:7-17), but he had not suggested it to them, and he did not know how they felt about it. (*Id*. at 322:4-9.) There is no NISD policy that prohibits female students with long hair from wearing two braids instead of one, or that requires a student to tuck her long hair under her shirt. (*Id*. at 306:12-29.)

The School Board decided to adopt Superintendent Rhodes' recommendation. In announcing the School Board decision, board member Kim Janke commented: "Although I disagree with the law presented in this case and understand and support why Mr. Rhodes made the decision that he made, I move that the Board grant the Level Three grievance...." (Ver. Compl., Ex. 9 at 20.)

### C. A.A.'s In School Suspension

On August 19, 2008, NISD agreed "not to discipline [A.A.] until the soonest of the following occurs, the student receives an injunction to prevent his compliance from the dress code or September 22, 2008, whichever occurs first." (Ver. Compl., Ex. 7.) On August 22, 2008, in response to inquiries from Plaintiffs, NISD appeared to change its position, stating that its understanding of the agreement, based on correspondence between counsel, was that the grace period would only be triggered if "NISD did not grant A.A. an exemption by August 20, 2008." (Ver. Compl., Ex. 11.)

A.A. began kindergarten on August 25th, 2008; he wore his hair in two long braids. (Prelim. Inj. Hr'g Tr., vol. II, 201:7-8.) On August 25, 2008, NISD informed Plaintiffs that A.A. would need to comply with the exemption by September 2, 2008, or "discipline would be imposed." (Ver. Compl. Ex. 12.) At one point during his first week of school, A.A. was in the boys'

bathroom, and some students came out and told a teacher that a little girl was in the boys' room. (Prelim. Inj. Hr'g Tr., vol. I, 151:3-8.)   The confusion was easily resolved, however, when the teacher realized it was A.A. (*Id.* at 158:9-13.) Later, on a field trip, a mother accidentally put A.A. in line with the girls instead of the boys. (*Id.* at 151:14-17.) During the first week of school, Plaintiffs Arocha and Betenbaugh were not contacted about any discipline problems involving A.A., the bathroom confusion, or any problems with A.A.'s hair falling in his eyes. (Prelim. Inj. Hr'g Tr., vol. II, 204:5- 206:-25.)

On September 3, 2008, A.A. was placed in In School Suspension ("ISS") for failure to comply with the Board's exemption policy. (Ver. Compl. Ex. 15.)   While in ISS, A.A. received one-on-one instruction (Prelim. Inj. Hr'g Tr., vol. I, 161:12-14), and thirty minutes of recess every day. (*Id.* at 163:23-25.) He was, however, deprived of the opportunity to socialize with other children. (*Id.* at 157:12-19.) Once A.A. was placed in ISS, there was another incident in which students told a teacher that a girl was in the boys' restroom. (*Id.* at 151:14-17.)

On October 3, 2008, this Court entered a Preliminary Injunction directing NISD to allow A.A. to return to class and wear his hair as he wants until further hearing on the matter.  Since his return to his regular class, A.A. has not interfered with the teacher's ability to teach. (*Id.* at 158:15-18.)  His hair sometimes falls in his eyes and his teacher has to tell him to tuck it behind his ear. (*Id.* at 154:25-155:9.)  The teacher occasionally has to make the same suggestion to girls wearing pigtails. (*Id.* at 159:5-8.)

Plaintiffs allege that NISD's exemption policy violates (1) A.A.'s rights to free exercise of religion under the First and Fourteenth Amendments, U.S. Const. amends. I, XIV § 1, and Texas' Religious Freedom Restoration Act ("TRFA"), Tex. Civ. Prac. & Rem. Code Ch. 110, (2) A.A.'s right to free expression under the First and Fourteenth Amendments, and (3) Plaintiff Arocha and Betenbaugh's Fourteenth Amendment right to raise A.A. according to their Native American

religion and heritage.   As a result, Plaintiffs seek declaratory and injunctive relief against NISD

pursuant to 42 U.S.C. § 1983 and TEX. CIV. PRAC. & REM. c. § 110.005 for the above violations.

This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 over Plaintiffs' causes of

action alleged under the Constitution of the United States and 42 U.S.C. § 1983, and supplemental

jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff A.A.'s cause of action under TRFRA.

Declaratory and injunctive relief are authorized by 28 U.S.C. § 2201 and § 2202, TEX. CIV. PRAC. &

REM. c. § 110.005(a) and FED. R. CIV. P. 57 and 65.

## II.    PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction requires that 'the applicant ... show (1) a substantial likelihood

that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the

injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom

he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.'"

*Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007) (quoting *Lake Charles Diesel,*

*Inc. v. General Motors Corp.,* 328 F.3d 192, 195-96 (5th Cir. 2003)).   Although the grant or denial

of a preliminary injunction rests in the discretion of the trial court, *Deckert v. Indep. Shares Corp.*,

311 U.S. 282, 290 (1940), "[w]e have cautioned repeatedly that a preliminary injunction is an

extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried

the burden of persuasion' on all four requirements." *Lake Charles Diesel*, 328 F.3d at 196 (citing

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 2003)).

## III.    SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  Free Exercise Clause

The Free Exercise Clause of the First Amendment, which has been applied to the states

through the Fourteenth Amendment, *see Cantwell v. Conn*., 310 U.S. 296, 303 (1940), provides that

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." *Church of Lukumi Babalu Aye, Inc v. City of Hialeah*, 508 U.S. 520 (1993). The Fourteenth Amendment protects citizens from all state agents, including school boards. *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 637 (1943). While school boards have "important, delicate, and highly discretionary functions," they must carry out their duties "within the limits of the Bill of Rights." *Id.*

### 1. Sincerely Held Religious Belief

Only beliefs rooted in religion are protected by the Free Exercise Clause, which, by its terms, gives special protection to the exercise of religion. *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 713-714 (1981). The Supreme Court long has recognized that determining whether a belief or practice is "religious" is a "difficult and delicate task." (*Thomas*, 450 U.S. at 714). In view of this difficulty, neither the Supreme Court nor the Fifth Circuit has set forth a precise standard for distinguishing the religious belief from the secular choice. *Theriault v. Carlson*, 495 F.2d 390, 394, n.6 (5th Cir. 1974). Other circuits have cautiously attempted to create a standard, characterizing religious beliefs as those that "address spiritual, not worldly concerns," *Callahan v. Woods*, 658 F.2d 679 (9th Cir. 1981), "fundamental and ultimate questions," *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025 (3d Cir.1982), and "ultimate as opposed to intellectual concerns," *International Soc. For Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430 (2d. Cir. 1981).

NISD granted Plaintiffs a religious exemption from the dress code, which seemingly implied that the School Board accepted the Plaintiffs' views regarding hair length as sincerely held religious beliefs. After Plaintiffs filed suit, however, NISD chose to contest the sincerity of Plaintiffs' beliefs. (Prelim. Inj. Hr'g Tr., vol. II, 350: 9-17.) The Court must therefore consider whether Plaintiffs have a sincerely held religious belief that hair should be worn long.

### a. Native American Religion

First, NISD contends that the Native American belief regarding long hair is cultural and not religious.  Dr. James Riding In, an Associate Professor of American Indian Studies at Arizona State University (Prelim. Inj. Hr'g Tr., vol. I, 36:20-22), testified regarding the history of Native American culture and religion.  The major commonality among Native American religious practices is a belief "in the interconnectedness of humans with animals, with plants, and with Mother Earth." (*Id*. at 72:16-17.)  Dr. Riding In described Native American religion as "a way of life" as opposed to discrete acts of praying or attending church.  (*Id*. at 79:3-6.)  Traditionally, religious beliefs and practices have varied greatly across tribes (*Id*. at 72:22-25), and many religious tenets were passed down orally.  (*Id*. at 74:14-75:3.).  Anthropologists' accounts of Native American beliefs are frequently inaccurate.  (*Id*.)  The historical record of Native American religion is therefore incomplete. (*Id*. at 75:1-6.)

Native American religion was greatly impacted by the federal government's efforts to assimilate Native Americans in the 19th and 20th century.  (*Id*. at 56:14-18.) Native American children were sent to boarding schools where teachers prohibited them from speaking their indigenous language and practicing their own religious beliefs.  (*Id*. at 43:15-25.)  Many of these children wore their hair long "as part of a custom...rooted in religious belief."  (*Id*. at 53:21-54:7.) At the boarding schools, however, they were forced to cut their hair because it was viewed as a symbol of "an inferior, backwards way of living."  (*Id*. at 80:8-14.)  Following the federal government's attempts at religious suppression, some Native Americans retained their traditional religious beliefs, some created Native American churches, and some turned to Christianity.  (*Id*. at 78:9-10.)

Today, in part because of the different traditions of tribes and in part because many traditions were destroyed by assimilation policies, there is "great diversity" within the Native

American community regarding hair length. (*Id.* at 61:17-20.)  Dr. Riding In testified that Native American culture is undergoing a process of "decolonization," which means an attempt to "reestablish many of the elements of culture that was lost and to live according to the traditional values, attitudes and beliefs." (*Id.* at 39:16-19.)  A common feature of this process is for Native American men to grow long hair.  For some men, this act has religious significance, and they believe their hair should only be cut during periods of mourning. (*Id.* at 49:3-13.)  This belief was traditionally common among the Northern Plains Indians, but it was not universally practiced among tribes. (*Id.*)

Other courts have acknowledged that, while for historical reasons, the Native American movement is comparatively "nebulous and unstructured," it is certainly a religion, indicated by its "system of beliefs concerning the relationship of human beings and their bodies to the nature and reality." *Alabama*, 817 F. Supp. at 1329.  In particular, the Fifth Circuit has recognized that the Native American custom regarding wearing long hair, "while in some parts cultural, has strong religious implications." *Diaz v. Collins*, 114 F.3d 69, 73 (5th Cir. 1997).  Other circuits have similarly recognized the religious significance of hair length in Native American communities. *Warsoldier v. Woodford*, 418 F.3d 989, 992 (9th Cir. 2005) (acknowledging that a tenet of the Cahuilla Tribes' religious faith is that hair must only be cut upon the death of a relative); *Gallahan v. Hollyfield*, 516 F.Supp. 1004 (E.D.Va. 1981), *aff'd* 670 F.2d 1345 (4th Cir. 1982) (recognizing that the plaintiff, of Cherokee Indian descent, followed a religious tenet dictating that his hair was "a sense organ" and that loss of hair equated to loss of a body part).  More specifically, the Eighth Circuit has held that while wearing long *braided* hair is not "an absolute tenet of Indian religion practiced by all Indians," it still warrants constitutional protection if it is a "deeply rooted religious belief." *Teterud v. Burns*, 522 F.2d 357, 360 (8th Cir. 1975).

### b. Plaintiffs' Religious Beliefs

Plaintiff Arocha claims to follow the Native American religious practice of wearing his hair long except when mourning a loved one. NISD has questioned his belief on several grounds. Superintendent Rhodes, who twice denied Plaintiffs' Level Two Exemption Request, characterized Plaintiff Arocha's beliefs as a "personal choice," noting that Plaintiffs had asked A.A. if he wanted to cut his hair. (Prelim Inj. Hr'g, vol. II, 301:24-302:3.) Superintendent Rhodes testified that Plaintiffs were unable to provide him with written evidence of their beliefs, a religion that could be researched, or a tribal affiliation. (*Id.* at 298:22-299:3.) He questioned Plaintiff Arocha's sincerity because Plaintiff Arocha admitted that he sometimes cuts his hair on the sides when the weather is warm. Rhodes was also troubled about Plaintiffs' sincerity when others in Needville showed him websites demonstrating that Plaintiffs were involved in the Goth community. [3] (*Id.* at 281:19-21.) Ultimately, Superintendent Rhodes felt that he could never gather enough information to determine that Plaintiffs' belief was sincerely religious. These concerns reflect those NISD voiced at the preliminary injunction hearing.

While the Supreme Court has not defined the term "religious," it has evaluated the merits of plaintiffs' purported religious beliefs. In *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707 (1981), the plaintiff was a Jehovah's Witness employed in a foundry. When he was transferred to a division that fabricated armaments, he requested a lay-off because working on weapons violated his religious principles. Indiana denied his request for unemployment benefits; the Indiana Supreme Court upheld the denial, calling the plaintiff's reasons for quitting a "personal philosophical choice" instead of religious. It based its decision on inconsistencies in the plaintiff's explanation of his beliefs and his practice of them and the fact that other Jehovah Witnesses testified that working on armaments was "scripturally acceptable."

---

[3] Plaintiff Arocha designs clothing for a living. (Prelim. Inj. Hr'g Tr., vol. II, 253:20.) The Goth community has shown a particular interest in the clothing he sells, so Plaintiff Arocha directs his advertising to the Goth community, and he and Plaintiff Betenbaugh travel to Goth conventions. (*Id.* at 255:1-19.) Plaintiff Arocha is not Goth, however, and his job does not conflict with his religious beliefs. (*Id.* at 276:6-13.)

The Supreme Court reversed, stating that "Courts should not undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 715. The Court refused to be persuaded by alleged inconsistencies in Thomas' beliefs, noting that when a plaintiff draws a line, "it is not for the Court to say it is an unreasonable one." *Id.* The Court noted that intra-faith differences were not "uncommon" and that the judicial process is "singularly ill equipped to resolve such differences in relation to the Religion Clause." *Id.* The Court held that "the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." *Id.* at 715-716.

In *Frazee v. Ill. Dept. of Emp. Security*, 489 U.S. 829 (1989), the plaintiff refused a temporary position because it would have required him to work on Sunday, which violated his belief that he should not work on "the Lord's day." The Illinois Department of Employment Security rejected his application for unemployment benefits, and the Illinois Appellate Court affirmed the decision on the grounds that the plaintiff's religious belief was not "found in a tenet or dogma of an established religious sect." *Id.* at 831. The Supreme Court reversed, rejecting the notion "that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization." *Id.* It was sufficient that Frazee's refusal was based on a "sincerely held religious belief." *Id.*

The Fifth Circuit evaluates plaintiffs' religious beliefs with similar deference. In *Ferguson v. C.I.R.*, 921 F.2d 588 (5th Cir. 1991), the plaintiff believed that parts of the Christian Bible prevented her from taking any oath or affirmation. When she appeared for a Tax Court hearing, she refused to be sworn before giving testimony; the Tax Court dismissed her petition for lack of prosecution. The Fifth Circuit overturned, noting that the Tax Court erred in evaluating her

religious belief and dismissing it because it did not violate any "recognizable religious scruple." *Id.* at 590-91.

Given Dr. Riding In's testimony, and the Fifth Circuit's ruling in *Diaz*, the Court has no difficulty finding that some Native American communities assign religious significance to hair length. Plaintiff Arocha clearly shares that belief, even though he does not belong to a tribe that practices it. He does not have to prove that all other Lipan Apaches have beliefs that are identical to his own; moreover, he is not required to prove his belief by pointing to a "tenet or dogma" of any particular Indian tribe or organization.[4] Plaintiff Arocha is only required to show that he himself has these "deeply held religious beliefs," which he has done. He describes his hair as "an outward extension of who we are and where we come from, our ancestry and where we're going in life." He taught A.A. that his hair demonstrates "how long [A.A.] has been here" and is "an extension of who [A.A.] is." His long hair addresses "fundamental" and "ultimate" concerns by helping him to understand himself and his place and direction in the world. *Cf. Africa v. Com. of Pa.*, 662 F.2d 1025, 1032 (3rd Cir. 1981) (holding that incarcerated plaintiff failed to assert a "religious" belief because his views did not mention a fundamental concern including, "the meaning and purpose of life").

There is no evidence that Plaintiff Arocha's beliefs are "purely secular," or motivated by strictly political or philosophical concerns.[5] *Callahan*, 658 F.2d 679 at 684 (citing *Wisconsin v.*

---

[4] Defendant's assertion, that the Lipan Apaches were historically referred to as "the bald ones," is therefore irrelevant to the Court's inquiry. Although it is not required to support his free exercise claim, Plaintiff Arocha's decision to wear his hair in braids despite the historical tradition of the Lipan Apaches can be explained by the phenomenon of "Pan-Indianism." Many older generations of Native Americans have denied their heritage and refused to acknowledge to their children that they are Indian or to pass on knowledge about their Indian ancestry. (Prelim. Inj. Hr'g. Tr., vol. I, 46:24-47:3.) As a result of losing contact with their original tribe, many younger generations of Indians have adopted one sense of "Indianness." Often, Pan-Indianism is based on images of Plains Indians, wearing long hair in braids, or sometimes free-flowing. Even if a person's original tribe did not adopt a certain practice, like wearing long hair, that person still might adopt the practice if it is commonly recognized as being "Indian."

[5] To the extent that Plaintiff Arocha's views about hair length involve his preference to be a "nonconformist" or follow a "personal grooming choice," as Superintendent Rhodes suggested (Prelim. Inj. Hr'g Tr., vol. II, 281:11-19), his beliefs

*Yoder*, 406 U.S. 205, 215 (1972)).    Plaintiff Arocha's beliefs are not "obviously shams and absurdities…devoid of religious sincerity."    *Cf. Theriault*, 495 F.2d at 394 (holding that an incarcerated plaintiff's "long list of court actions" and "lengthy prison record" necessitated careful scrutiny of his claims of religious sincerity).    Plaintiff Arocha has not cut his hair in ten to eleven years.  He refused to cut his hair when prevailed upon by an employer, and he maintained its length through an involved medical procedure that included brain surgery.

Plaintiff Arocha's decision to shave his hair on the sides does not weaken the sincerity of his religious beliefs for the purpose of his free exercise claim.  As the Supreme Court found in *Thomas*, it is not the Court's place to question where a plaintiff "draws lines" in his religious practice.  405 U.S. at 715.  Upon inquiry from the Court about shaving the sides of his head, Plaintiff Arocha responded that he had "kept the length."  Plaintiff Arocha appears to find significance in the fact that his hair is long, not full, and the Court is in no position to evaluate how Plaintiff Arocha reconciles this distinction.    The Court therefore finds that Plaintiffs Arocha and A.A. have a sincerely held belief that their hair should be worn long.

### 2.  Substantial Burden

#### a.  The Exemption Policy

After demonstrating that he possesses a "sincerely held religious belief," a plaintiff must prove that a government regulation substantially burdens that belief.  Defendants argue that, in order to prove a regulation imposes a substantial burden, the plaintiff must show that the regulation in question "compels action or inaction with respect to the sincerely held religious belief."  Defendants point to *Hicks v. Garner*, 69 F.3d 22 (5th Cir. 1995), as the source of this standard. *Hicks*, which discussed a prisoner's claim brought pursuant to the Religious Freedom Restoration

---

are still protected because of their obvious religious content.  "The coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded to the religious one." *Wiggins v. Sargent*, 753 F.2d 663, 666-667 (8th Cir. 1985) (citing *Callahan*, 658 F.2d 679 at 685).  The First Amendment is not limited to purely religious claims; to the extent that religious and cultural practices overlap, the area of overlap is protected.  *Id.*

Act (RFRA), did not actually set forth a definition of "substantial burden" to be applied in the free exercise context. Rather, the *Hicks* court noted that courts had defined "substantial burden" many different ways and collected various definitions from other circuits, without expressing a preference. *Id*. at 26 n. 22.

Plaintiffs urge the Court to employ the definition of "substantial burden" used in *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004). In *Adkins*, the Fifth Circuit had to determine the definition of "substantially burden" to be applied under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). After considering the plain wording of the statute, its legislative history, and the Supreme Court's use of the term "substantially burden" in other contexts, the *Adkins* court held that a regulation creates a "substantial burden" if it "truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs." *Id*. at 570. The effect of a government action or regulation is "significant" when it either (1) influences the adherent to act in a way that violates his religious beliefs or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and on the other hand, following his religious beliefs. *Id*. A government regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed. *Id*. The Court believes that this is the correct standard to apply.

The School Board's exemption policy burdens A.A.'s significantly held religious belief that his hair should be worn long. A.A.'s hair is approximately thirteen inches long. (Prelim. Inj. Hr'g., Pls.' Ex. 4-5.) The School Board's policy will require him to wear it "in a tightly woven braid," stuffed down the back of his shirt, for the rest of his academic career at NISD. By the policy's terms, A.A. must wear his hair in his shirt during recess, on field trips, and on the school bus.

When he becomes older, he will have to wear his hair down the back of his shirt at football games, school dances, and, presumably, his high school graduation.

The policy will deny A.A. the opportunity to express a religious practice that is very dear to him and his father. *See e.g. Chalifoux v. New Caney Indep. Sch. Dist.*, 976 F.Supp. 659, 667 (S.D.Tex. 1997) (rejecting a dress code exemption, which required students to wear rosaries under their shirts, because it burdened "a sincere expression of their religious beliefs"). A.A. will also be exposed to punishment if he violates the exemption policy. There is no doubt the arrangement will cause him profound discomfort: Plaintiff Arocha testified that he becomes uncomfortable when his own hair becomes trapped under his shirt for even a few moments. It is also likely that A.A. will be subject to just as much teasing and ridicule by wearing his long hair inside his shirt than if he wore it exposed. These will be the terms of his existence for the next eleven years; otherwise, he will be forced to cut his hair, or transfer to another school district.

By imposing a physically burdensome restriction on A.A., which will last indefinitely, the School Board's exemption policy will influence him to cut his hair in violation of his religious beliefs. In the alternative, it forces him to choose between the generally available benefit of attending Needville public schools, or, on the other hand, following his religious beliefs. The policy's effects go far beyond denying him some benefit that is not otherwise generally available or preventing him from acting in a way that is not otherwise allowed. Female children attending NISD are allowed to wear their long hair exposed and in two braids, for purely secular reasons. Even though the School Board found it necessary to grant A.A. a religious exemption, it did not extend him this same freedom to wear his long hair in a comfortable, practical manner.

### b. The Annual Renewal Requirement

Plaintiffs also contest the requirement that A.A. annually reapply for a religious exemption to the NISD dress code. This requirement, unlike the exemption policy, is generally applicable.

(Prelim. Inj. Hr'g. Tr., vol. II, 290:1.)   In *Littlefield v. Forney*, 268 F.3d 275, 293-294 (5th Cir. 2001), the Fifth Circuit found that a similar policy, which required families to reapply for a religious exemption from a school's dress code on an annual basis, did not burden the plaintiffs' exercise of their sincerely held religious beliefs.  Plaintiffs' request for relief from this requirement should therefore be denied.

### 3.  Level of Scrutiny

Plaintiffs advance three separate theories as to why the exemption policy should be subject to strict scrutiny.  For the reasons outlined below, the Court finds all three persuasive.

#### a.  The Nature of the School Board's Regulation

The level of scrutiny to be applied to a plaintiff's free exercise claim is determined by the nature of the law or regulation being applied.  A law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.  *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990)).  A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.  *Id.*  "Neutrality and general applicability are interrelated, and … failure to satisfy one requirement is likely an indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531.

Defendant argues that, because NISD's dress code is neutral, and because it is universally applied, Plaintiffs' claims should be subject to rational basis review.  Defendant misapprehends the nature of Plaintiffs' claim: they are not challenging the dress code, but rather the exemption policy NISD created specifically for A.A.  The Court evaluates this policy, and not the NISD dress code, to determine if it is neutral and generally applicable.

It is undisputed that the exemption policy was created solely for A.A., and it applies to him alone. It is not, therefore, generally applicable. An inquiry into the regulation's neutrality begins with the policy's text. *Id.* at 533. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context. *Id.* The exemption policy, as read into the record at the second School Board meeting, makes no reference to A.A.'s particular religion or the spiritual significance of his hair; it is therefore facially neutral.

*Lukumi* requires courts to look beyond a regulation's text, however, to determine its neutrality. The Free Exercise Clause requires the court to "'survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerry-manders.'" *Id.* (citing *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (1970)). The effect of the law in its real operation is "strong evidence of its object." *Id.* In *Lukumi*, a group of Santeria practitioners challenged city ordinances that banned animal sacrifice in order to prevent animal cruelty and protect public health. The Supreme Court described the ordinances as "under inclusive" because they failed to prohibit nonreligious conduct that endangered these interests in a similar or greater degree than Santeria sacrifice. *Id.* at 536; *see also Blackhawk v. Pennsylvania*, 381 F.3d 202, 209. Because the ordinances banned Santeria sacrifice even when it was not necessary to protect public health, the Court also found that the ordinances proscribed "more religious conduct than is necessary" to achieve their purported ends. "It is not unreasonable to infer, at least when there are no persuasive indications to the contrary, that a law which visits gratuitous restrictions on religious conduct seeks not to effectuate the state governmental interests, but to suppress the conduct because of its religious motivation." *Id.* at 538 (citations omitted).

According to Superintendent Rhodes, who helped craft the exemption policy, it was created to have A.A.'s hair "resemble the rest of the student body in Needville." (Prelim. Inj. Hr'g. Tr., vol. I, 17:1-6.) Rhodes admitted that the policy was not created with the five specific goals of the NISD

dress code in mind.  (*Id.* at 18:5-17.)   He testified that the policy was created to instill discipline and maintain order and hygiene, but he later admitted that it is not more hygienic to have one braid instead of two.  (Prelim. Inj. Hr'g. Tr., vol. II, 319:12-23.)  Assuming that the policy's purpose is to promote uniformity, discipline, order and hygiene, it is under inclusive.  As mentioned earlier, female students are allowed to wear their long hair exposed and in two braids without being viewed as a threat to the school's order and hygiene.  To the extent that the policy is meant to make A.A. look like the rest of the student body, he will stand out as the only child wearing a thirteen- inch braid tucked inside his shirt.  The policy proscribes more religious conduct than is necessary to achieve its stated goals.  It is difficult to imagine that allowing one male child to wear long hair, as part of his religious beliefs, would disturb the school's sense of order and its efforts to teach its students hygiene.  NISD is certainly able to discipline A.A. if he disrupts his class in anyway, or if he violates another provision of the dress code.

In *Lukumi*, the Court also looked to its equal protection jurisprudence for guidance in determining a law's neutrality. *Lukumi*, 508 U.S. at 540.   Relevant evidence of neutrality includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment of the official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision-making body. *Id.* (citing *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977)).  These objective factors bear on the question of discriminatory intent.

The exemption policy's history demonstrates that it was not created for a neutral purpose, but rather to burden A.A.'s practice of his religious belief.  NISD's reaction to Plaintiffs' request for an exemption indicates that, from the beginning, NISD was unwilling to accommodate A.A.'s religious practice.  Superintendent Rhodes made statements to the press implying that, if Plaintiffs did not like the dress code, they should not move to Needville.  The School Board, and

Superintendent Rhodes, allowed Plaintiffs to proceed through the entire exemption request process, only to deem their request moot after a "standing room only" community meeting. These tactics seem designed to make Plaintiffs' abandon their request, or leave the district, rather than to seriously consider A.A.'s religious beliefs. Only after Plaintiffs hired counsel did the School Board grant A.A.'s religious exemption, but the comment of Board Member Kim Jancke indicates that they did so with great reluctance.

Because the exemption policy is neither neutral nor generally applicable, it must undergo "the most rigorous scrutiny." *Lukumi*, 508 U.S. at 546. It must serve government interests of the "the highest order" and be narrowly tailored in pursuit of those interests. Having A.A. "resemble the rest of the student body at Needville" is certainly not a compelling government interest. Even assuming that NISD's interest in maintaining order and hygiene among its students constituted a compelling government interest, the exemption policy is not the least restrictive means of pursuing those interests. A better policy would be to allow A.A. to wear his hair long in accordance with his religious beliefs, but to make him comply with the rest of the NISD dress code, as it is applied to other students.

### b.  TFRA

Plaintiffs also assert that the exemption policy should be subject to strict scrutiny under the Texas Religious Freedom Act ("TRFA").[6]  TRFA restored the compelling interest test to state law claims, following the Supreme Court's decision in *City of Boerne*, 521 U.S. 507 (1997), which held that the federal RFRA was unconstitutional. TFRA provides that a government agency may not substantially burden a person's free exercise of religion. TEX. CIV. REM. & PRAC. c. § 110.003(a). The government action does not violate the act, however, if the government demonstrates that the

---

[6] NISD argues that the exemption policy is not prohibited by TFRA because the Act only applies in situations where governmental entities have not granted a religious exemption.  It cites no cases to support this conclusion, which is not evident from the text of the statute.

application of the burden to the person is in furtherance of a compelling government interest and the least restrictive means of furthering the interest.  *Id.* at § 110.003(b).  As discussed above, the Court finds the exemption policy does not survive this strict level of scrutiny.

### c.   Hybrid Clam Standard

Plaintiffs argue that, even if the Court determines that the exemption policy was not neutral and generally applicable, the policy should still be subject to more than rational basis review because they advance a "hybrid claim."  In *Smith*, Justice Scalia acknowledged that the First Amendment only bars the application of neutral, generally applicable laws to religiously motivated action in cases that involve not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and the rights of parents to direct the education of their children.  *Smith* at 1601.  The language in *Smith* was rooted, in part, in the Court's reasoning in *Wisconsin v. Yoder*, 406 U.S. 205 (1972).  In that case, the Supreme Court addressed the rights of Amish parents to keep their children from progressing past the eighth grade, in violation of Wisconsin's compulsory education laws.  In upholding the rights of the Amish parents, the Supreme Court held, "when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the state is required to sustain the validity of the states' requirement under the First Amendment."  *Yoder*, 406 U.S. at 233 (citations omitted).

The Fifth Circuit adopted the "hybrid claim" standard in *Society of Seperationists v. Herman*, 939 F.2d 1207, 1216 (5th Cir. 1991), in which the plaintiff argued that being forced to state an oath or affirmation violated not only her freedom of religion but also her freedom of speech. The Court of Appeals found that *Smith* specifically excepts "religion-plus-speech" cases from the sweep of its holding.  *Society of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1217

(1991)[7]; *see also Alabama*, 817 F.Supp. at 1332 (holding that, in hybrid claim cases, a school district must demonstrate that a regulation has more than a reasonable relationship to a substantial state interest); *Chalifoux*, 976 F.Supp. at 671 (same).

Plaintiffs have presented a hybrid claim, successfully demonstrating that the exemption policy violates not only A.A.'s free exercise rights, but also his rights to free expression and his parents' due process rights. Pursuant to *Yoder* and *Smith*, the Court must therefore determine whether the regulation bears more than a reasonable relationship to its stated goals. The Court finds that it does not. As has been discussed, the School Board certainly could find other means to achieve its stated goals than to have A.A. wear his hair under his shirt. Enforcing normal classroom rules will satisfy concerns about order, and the exemption policy has no real effect on student hygiene. While one could imagine that the exemption policy might be one means of achieving NISD's goals, it is certainly not the most effective. *See Chalifoux*, 976 F.Supp. at 671.

## B. Free Speech

### 1. Expressive Conduct

Plaintiffs assert that NISD's requirement that A.A. cover his braids violates his First Amendment right to freedom of speech. The First Amendment protects private, religious speech. *Chalifoux*, 976 F.Supp. at 664 (citing *Widmar v. Vincent*, 454 U.S. 263, 269 (1981)). The Supreme Court has long recognized that the First Amendment protects more than just the written or spoken

---

[7] Other circuits are divided on the viability of the *Smith* hybrid claim standard. *Combs v. Homer-Center School District*, 540 F.3d 231, 244 (3rd Cir. 2008) (collecting cases). The Second, Third, and Sixth Circuits have held that the language is dicta, and have refrained from using a stricter legal standard to evaluate hybrid claims. *Id.* at 245 (discussing *Leebaert v. Harrington*, 332 F.3d 134, 143 (2d Cir. 2003); *Watchtower Bible v. Tract Soc'y of New York, Inc. v. Stratton*, 240 F.3d 553, 561-562 (6th Cir. 2001)). The First Circuit and the D.C. Circuit have acknowledged that the theory warrants heightened scrutiny, but require a plaintiff first to prove that the free exercise claim is joined with an independently viable companion right. *Combs*, 540 F.3d at 245 (discussing *Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 18-19 (1st Cir. 2004); *Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C.Cir. 2001)). The United States Court of Appeals for the Ninth and Tenth Circuits recognize hybrid rights and require a plaintiff to raise a "colorable claim" that a companion right has been violated. *Combs*, 540 F.3d at 246 (discussing *San Jose Christian Coll. v. Morgan Hill*, 360 F.3d 1024, 1032 (9th Cir. 2004); *Swanson v. Guthrie Indep. Sch. Dist.*, 135 F.3d 694, 700 (10th Cir. 1998)).

word; conduct might be sufficiently communicative to fall within the scope of the First Amendment. *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (citing *Spence v. Washington*, 418 U.S. 405, 409 (1974)).

Defendant argues that a public school student's freedom to choose a hair style is, as a matter of law, not protected by the First Amendment. The Fifth Circuit said as much in *Karr v. Schmidt*, 460 F.2d 609 (1972), a Vietnam War-era case involving a high school student who wished to wear his hair long in violation of his school's dress code. In *Karr*, the Fifth Circuit was "doubtful" that the wearing of long hair had sufficient communicative content to entitle it to First Amendment protection: "For some, no doubt, the wearing of long hair is intended to convey a discrete message to the world. But for many, the wearing of long hair is simply a matter of personal taste or the result of peer group influence." *Karr*, 460 F.2d at 613.

The Fifth Circuit later changed its position. In *Canady v. Bossier Parish School Board*, 240 F.3d 437 (5th Cir. 2001), the Fifth Circuit declined to apply *Karr*'s reasoning, at least as it pertains to clothing. In *Canady*, a group of parents and students challenged Bossier School System's attempt to adopt a new dress code. The district court relied on *Karr* in finding that choice of clothing, like hair style, is a matter of personal taste or style that is not afforded First Amendment protection. The *Canady* Court disagreed: "While a person's choice of clothing may be predicated solely on considerations of style and comfort, an individual's choice of attire also may be endowed with sufficient levels of intentional expression to elicit First Amendment shelter." *Canady*, 240 F.3d at 440. The Court noted that "Clothing may also symbolize ethnic heritage, religious beliefs, and political social views." *Id*. It concluded that, while "this sort of expression may not convey a particularized message to warrant First Amendment protection in every instance, we cannot declare that expression of one's identity and affiliation to unique social groups through choice of clothing will never amount to protected speech." *Id*. at 441.

27

The Canady Court recognized that Karr's holding rested on the following language in *Tinker v. Des Moines Ind. Comm. School Dist.*: "The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style, or deportment... Our problem involves direct, primary First Amendment rights akin to 'pure speech.'" 393 U.S. at 507- 508.  The *Canady* Court criticized the *Karr* Court's conclusion that this language suggests that "hair style never warrants First Amendment protection."  It noted that "if this interpretation is correct, then every choice of clothing, regardless of the intent of the wearer to communicate a particularized message, would not qualify as protected speech." *Canady*, 240 F.3d at 440, n. 1. It instead chose to apply the *Spence* and *Johnson* test for expressive conduct.  *Id*.  The Fifth Circuit reaffirmed this position in *Littlefield v. Forney*, 268 F.3d 275 (5th Cir. 2001), in which plaintiffs challenged a Texas school district's adoption of a uniform dress code.

Although the *Canady* court specifically discussed clothing, and *Littlefield* involved a challenge to an entire dress code, the Court believes that the reasoning of these two cases, rather than the per se rule announced in *Karr*, applies to a student's choice of hair style.  The Court therefore evaluates Plaintiffs' claims under the *Spence* and *Johnson* tests.  To determine whether conduct possess sufficient communicative elements to warrant First Amendment protection, courts must determine whether the conduct intends to convey a particularized message and the likelihood that the message will be understood by those who view it.  *Johnson*, 491 U.S. at 404 (citing *Spence*, 418 U.S. at 410-411).  In evaluating whether conduct is "expressive," the court must consider the context within which it occurred.  *Johnson*, 491 U.S. at 405.

A.A.'s braids convey a particularized message of his Native American heritage and religion.  Dr. Riding In testified that it is a common phenomenon for Native American men to wear their hair long and in braids as part of the decolonization process.  In *Alabama*, our sister court recognized that long hair in Native American culture is "rife with symbolic meaning."  817 F.Supp. 1333-1334.

Plaintiff Arocha believes in wearing long hair, in part, "as a symbol, an outward extension of who we are and where we come from, our ancestry and where we're going in life. It's a constant reminder to us of who we are." Despite his young age, A.A. seems to assign his braids a similar meaning. When people ask him why he has long hair, he tells them it is because he is Native American. He chose not to cover his braids as part of a Halloween costume.

Member of the NISD community are likely to understand the meaning of A.A.'s long hair worn in braids. A predominant image of Native Americans in pop culture is the sight of Plains Indians wearing their hair in long braids. (Prelim. Inj. Hr'g. Tr., vol. I, 80:15-25.) In fact, there are photographs hanging on the walls of Needville Elementary School that depict Native Americans wearing their hair long and in braids (Prelim. Inj. Hr'g., Pls. Ex. 1) and books in the school library depicting Native Americans wearing long hair. (*Id.* at Ex. 6.) Given these depictions, and the fact that A.A.'s father also wears his hair in long braids, teachers and students will likely understand that A.A.'s braids reflect his Native American heritage.[8]

### 2. Level of Scrutiny

The level of scrutiny applied to regulations of student expression depends on the substance of the message, the purpose of the regulation, and the manner in which the message is conveyed. *Canady*, 240 F.3d at 441. The Supreme Court has recognized three categories of student speech regulation. *Morse v. Frederick,* 551 U.S. ___, 127 S.Ct. 2618 (2007). The first category includes regulations directed at specific student viewpoints, such as the restriction found in *Tinker*, which prohibited students from wearing black armbands in protest of the Vietnam War. 393 U.S. 503. In *Tinker*, the Supreme Court held that, when officials attempt to restrict students from expressing

---

[8] At hearing, Defense counsel argued that community members will not recognize A.A.'s message because many men, such as Willie Nelson and Snoop Dogg, wear their hair long and in braids for reasons other than expressing Native American heritage. While the Court does not express an opinion on the truth of this allegation, it notes that these entertainers are wearing their long hair in very different contexts, that change the content of their message.

particular political views, they must demonstrate that the expression would "substantially interfere with the work of the school or impinge upon the rights of the other students." *Id.* at 509.

The second category encompasses the regulation of lewd, vulgar, obscene, or plainly offensive speech. *Bethel School District v. Fraser*, 478 U.S. 675 (1986). Educators have the authority to protect students from such speech. *Id.* The third category includes regulations of student expression that are related to school-sponsored activities. *Hazelwood School District v. Kulmeier*, 484 U.S. 260 (1988). In *Hazelwood*, the Supreme Court held that school officials could regulate school-sponsored activities such as publications and theatrical productions if their "actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273.

Recognizing that Bossier School System's proposed dress code did not fit into any of these categories, the *Canady* Court created a fourth category[9] for viewpoint-neutral restrictions on student expression that happens to occur on school premises. *Canady*, 240 F.3d at 443. The Court reasoned that the level of scrutiny to be applied should be higher than that in cases involving student activity but less stringent than the school board's burden in *Tinker*. It found the expressive conduct test articulated in *U.S. v. O'Brien*, 391 U.S. 367 (1968), and the traditional time, place, and manner analysis appropriate, noting that they are "virtually the same standards of scrutiny for purposes of assessing the validity of the school uniform policy." *Id.* The Fifth Circuit, and our sister courts, have continued to apply this fourth level of scrutiny in cases involving viewpoint and content-neutral restrictions on expressive student conduct. *See Porter v. Ascension Parish School Board*, 393 F.3d 608 (5th Cir. 2004); *Littlefield v. Forney*, 268 F.3d 275 (5th Cir. 2001); *Pounds v. Katy Independent School District*, 517 F.Supp.2d 901 (S.D. Tex. 2007). Thus, the School Board's uniform policy will pass constitutional scrutiny if it furthers an important or substantial government

---

[9] Since *Canady*, the Supreme Court has created an additional category for regulations that aim to prevent illegal drug use. *Morse v. Frederick*, 127 S.Ct. at 2629.

interest; if the interest is unrelated to the suppression of student expression; and if the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest. *Canady*, 240 F.3d at 443 (citing *O'Brien*, 391 U.S. at 377).

The Court finds that the exemption does not satisfy the third prong of the *O'Brien* test, because the incidental restriction it places on A.A.'s freedom of expression is more than necessary to promote the school's stated interests of promoting order, discipline, and hygiene. Defendants have not demonstrated that the restrictions the exemption imposes on A.A. are necessary to further the exemption's purported goals. *See, e.g., Chalifoux*, 976 F.Supp. 659 (holding that a school's requirement that students wear rosaries tucked under their shirts did not further the school's interest in reducing gang violence).

### C. Due Process

Plaintiffs also claim that NISD has interfered with Plaintiffs Arocha and Betenbaugh's due process right to raise A.A. in accordance with their own religious beliefs. In *Wisconsin v. Yoder*, the Supreme Court recognized "the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children." 406 U.S. 205, 232 (1972). Parents have the right to inculcate their children with moral standards, religious beliefs, and elements of good citizenship. *Id.* at 232. The power of the parent, however, even when linked to a free exercise claim, may be limited if it appears that the parental decision will jeopardize the health and safety of the children, or have the potential for significant state burdens. *Id.* at 232-234.

Even in the free exercise context, a parent's right to control her children's upbringing and education is neither absolute nor unqualified. *Combs v. Homer-Center School District*, 540 F.3d 231, 248 (3rd Cir. 2008). In *Combs*, the Third Circuit rejected the parental due process claim of a group of Christian parents who home-schooled their children. The parents alleged that the state's requirement that they comply with Pennsylvania's reporting and review procedures violated their

parental due process rights on religious grounds.  The Court of Appeals rejected their claim, noting that the statute at issue did not "interfere, or authorize interference, with the parent's religious teachings and/or use of religious materials."  540 F.3d at 249.  In another recent decision, *Parker v. Hurley*, 514 F.3d 87, 105 (1st Cir. 2008), the First Circuit recognized that, at the heart of a due process claim is some showing of coercion or compulsion.  The plaintiffs were parents who objected to an elementary school's use of children's books that described families with same-sex parents.  The plaintiffs claimed that the school was trying to indoctrinate their children with the belief that homosexual marriage is acceptable.  In rejecting their claim, the First Circuit noted that "the parents do not allege coercion in the form of a direct interference with their religious beliefs, nor of compulsion in the form of punishment for their beliefs...." *Id.*

The Court finds that Plaintiffs Arocha and Betenbaugh have presented a valid due process claim.  NISD's dress code violates their right to direct A.A.'s religious upbringing and effectively overrides their ability to pass their religion onto A.A. *Combs*, 540 F.3d at 250 (citing *Parker*, 514 F.3d at 100).  Even if NISD's policy does not, on its face, force A.A. to cut his hair, it certainly increases the likelihood that he will choose to do so.  The interference will not just be temporary; rather, it will continue for A.A.'s entire academic career at NISD. *Cf. Hansen v. Ann Arbor Public Schools*, 293 F.Supp.2d 780, 814 (finding that a fifty-minute panel discussion on homosexuality, which students could opt not to attend, did not present a "*Yoder*-like" clash between the essence of a religious culture of an entire community and the beliefs espoused by the panelists).  The Court has already discussed how the exemption policy will impose a substantial burden on both A.A.'s religious practice and his physical comfort.  As a result, the exemption policy comes much closer to direct coercion and compulsion than did the situations discussed in *Combs* and *Parker*.

When a parent's due process right to raise his child is combined with a free exercise claim, more than a "reasonable relation to some purpose within the competency of the [s]tate" is required

to sustain the validity of the state's requirement under the First Amendment.  *Yoder*, 406 U.S. at 232.  In cases involving the purely secular interest of parents to direct their childrens' upbringing and education, the Fifth Circuit applies the rational basis review to the state regulation.  *Littlefield v. Forney*, 268 F.3d at 290-291.  Rational basis review is not appropriate in this case, however, because NISD's policy implicates Plaintiff Arocha and Betenbaugh's fundamental religious practices under the First Amendment.  NISD must therefore show that there is more than a "reasonable relation" to some purpose within the competency of the state to sustain the validity of the state's requirement.  *Yoder*, 406 U.S at 233.  The Court has already found that the exemption policy does not survive this heightened level of scrutiny.

## IV.    IRREPARABLE INJURY

Plaintiffs have demonstrated that, absent an injunction, they will suffer irreparable injury.  If A.A. chooses to remain in school, but does not follow the School Board's exemption policy, he will be sent to ISS  In that isolated environment, he will be deprived of the educational and social benefits that come with learning with one's peers at such a young age.  (Prelim. Inj. Hr'g. Tr., vol. I, 157:6-14.)  If he chooses to abide by the policy, he will suffer the harms already described.  Plaintiffs' only other alternatives are to cut A.A.'s hair or leave Needville.

## V.    THREATENED HARM TO NISD

NISD has not demonstrated that A.A.'s wearing his hair long and in two braids substantially interferes with the school's functions or impinges on the rights of other students.  After this Court granted the Preliminary Injunction, A.A. spent approximately two weeks in his regular class before the next evidentiary hearing.  At that hearing, his kindergarten teacher testified that in the time he had been in his regular class, A.A. had not caused any behavioral problems or had any problems with other students.  His hair sometimes falls in his eyes, but his teacher testified that this same problem sometimes occurs with girls.  The other incidents that were described, such as students

telling teachers that a girl was in the boy's bathroom, or a mother confusing A.A. for a girl when lining students up for a field trip, do not rise to the level of a substantial interference with the school's work. *Cf. Blackwell v. Issaquena County Board of Education*, 363 F.2d 49 (5th Cir. 1966) (finding that students' right to wear "freedom buttons" was not protected conducted when students disturbed classes and created a state of confusion by trying to pin buttons on other, unwilling students). Moreover, these problems seem likely to diminish over a very short period of time.

## VI.  PUBLIC INTEREST

The public has a strong interest in the enforcement of constitutional rights, particularly in the context of public schools. "That they are educating the young for citizenship is reason for scrupulous protection of constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *West Virginia State Board of Education v. Barnette*, 319 U.S. at 637.

## VII.  CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Preliminary Injunction as to the NISD exemption policy adopted for A.A. is **GRANTED**. Plaintiffs' Motion is **DENIED** as to the NISD requirement that A.A. reapply for a religious exemption every year.

The parties have agreed, pursuant to FED. R. CIV. P. 65(a)(2), to consolidate the trial on the merits with the preliminary injunction hearing. NISD is therefore **PERMANENTLY ENJOINED** from applying its exemption policy to A.A. without further order of this Court.

**IT IS SO ORDERED.**

**SIGNED** this _____ day of January 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

34

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL
FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY
EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT**